564 S.E.2d 653

Joan Caldwell JOHNSON, Bryce Anderson, Lorraine Witherspoon Baker, William Bell, Faye Blaylock, Sara Edell Boan, Mike Brewer, Mike Brown, Ronald Callahan, Sandra Coulter, Lisa Crum, Andreas Drutis, Darryl Bernard Epps, Buster Elfin Floyd, Deanna Kay Frans, William Joseph Harnett, Jr., George Henley, Loretta Jones, Margaret Locklear, Tammy Locklear, Linda McCleod, William McCormick, Hugh Meise, Patty Miller, Andrew Nobles, Gary Padgett, Mary Pinchback, Vardry Pittman, Albert J. Samra, Mason Skeenes, Danny Kay Smith, Amber Strickland, Charles Stubbs, Lonya Thigpen, James Thompson, Joseph Chester Walker, Jessie Williams, Valerie Williams, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

COLLINS ENTERTAINMENT COMPANY, INC., Ace Amusement, LLC, American Amusement Company, Inc., American Amusement of Aiken, Inc., B & J Amusement, Best Amusement Co., Broyles & Lutz, Inc., CBA Games, Inc., Carousel Amusements, Coley, Inc., Drew Industries, Fast Freddies, Great Games, Inc., Greenwood Music Co., Inc., H & J of South Carolina, Inc., Holliday Amusement Company of Charleston, Inc., Hoyts Music Co., Inc., Huckleberry Amusement, Inc., Ingram Investments, J.M. Brown Amusement Co., Inc., Joytime

Distributors & Amusement, MHJ Corporation, MHS Enterprises, Inc., Martin Coin Machine, Inc., McDonald Amusement Co., Midlands Gaming Corp., Pedroland, Inc., R.L. Jordan Oil Co. of North Carolina, Red Dot Amusements, Rosemary Coin Machines of Florence, Inc., Scott's Vending Inc. of Columbia, Sumter Petroleum Co., Tim's Amusement, Inc., Video–Matic Amusements, Inc., H. Hugh Andrews, II, Pamela A. Andrews, Dwayne I. Bohannon, J.M. Brown, Don E. Broyles, Grace E. Coley, Fred Collins, J. Samuel Cox, Kenneth G. Flowe, Carey Hardee, Scott G. Hogue, Lowell E. Holden, Patricia Holliday, Warren P. Holliday, Henry E. Ingram, Steven E. Lipscomb, Tim Mahon, Jimmy Martin, Jr., Cynthia McDonald, James McDonald, Allan Schaefer, David R. Simpson, Ron Simpson, Mickey H. Stacks, William Darwin Wheeler, and Hershel L. Williamson, Defendants.

No. 25474.

Supreme Court of South Carolina.

Heard Dec. 11, 2001.

Decided May 28, 2002.

See also 333 S.C. 96, 508 S.E.2d 575.

616

618

Lawrence Edward Richter, Jr., and David K. Haller, both of The Richter Firm, of Mt. Pleasant; R. Randall Bridwell, of Columbia; and Richard Mark Gergel, W. Allen Nickles, III, Carl L. Solomon and David E. Rothstein, of Gergel, Nickles & Solomon, of Columbia, all for Plaintiffs.

Dwight F. Drake, C. Mitchell Brown, B. Rush Smith, III, Zoe Sanders Nettles and R. Bruce Shaw, all of Nelson Mullins Riley & Scarborough; A. Camden Lewis, Mary Geiger Lewis and Mark W. Hardee, of Lewis Babcock & Hawkins, L.L.P., all of Columbia, for Exhibit A Defendants.

Richard A. Harpootlian, of Richard A. Harpootlian, P.A., of Columbia, for Exhibit B Defendants.

J. Boone Aiken, III, of Aiken, Bridges, Nunn, Elliott & Tyler, of Florence; and James B. Richardson, Jr., of Richardson & Birdsong, of Columbia, for Defendant Pedroland, Inc.

TOAL, Chief Justice.

We agreed to answer the following questions certified by the United States District Court for the District of South Carolina:

I. Does the ruling in *Video Gaming Consultants v. South Carolina Dep't of Revenue*, 342 S.C. 34, 535 S.E.2d 642 (2000), apply to the second phrase in S.C.Code Ann. § 12–21–2804(B) prohibiting the offering of "special inducements" or is that portion of the statute otherwise unconstitutional on its face?

II. Would S.C.Code Ann. § 12–21–2804(B) be unconstitutional as applied, if construed to prohibit the offering of cash payouts in excess of $125?

III. Is the special inducement prohibition in S.C.Code Ann. § 12–21–2804(B) applicable to persons who do not themselves "maintain a place or premises," but instead lease machines to others who "maintain a place or premises" on a basis which results in the sharing of profits and under circumstances in which the lessor is aware of the activities which violate section 12–21–2804(B) and, despite that knowledge, accepts profits from the operation of the machines at issue?

IV. Under the findings of fact set forth in the District Court's Memorandum Opinion on Plaintiffs' Motion for Partial Summary Judgment, entered April 28, 1999, in which the facts were viewed in the light most favorable to the defendants, is the defendants' conduct in offering or allowing to be offered, the payment of sums in excess of $125 for credits accumulated on a video gambling machine subject to prosecution under S.C.Code Ann. § 12–21–2804(F) as the unlawful offering of a special inducement to gamble as prohibited by Section 12–21–2804(B)?

V. While the general operation of the devices at issue was authorized by law during all times at issue, and while South Carolina law generally exempts the operation of

the devices at issue from statutory penalties under the state's criminal laws relating to gambling, would the activity alleged nonetheless become "a gambling business which is a violation of the law of [the] State" of South Carolina if defendants are proven to have routinely offered and made payouts in excess of that allowed by state law or to have created fraudulent records to disguise the making of such payouts?

VI. Does the availability of a remedy under S.C.Code Ann. §§ 32–1–10 and 32–1–20 for certain gambling losses preclude plaintiffs from seeking recovery under other state law theories for: (a) losses which are compensable under these sections if timely filed; or (b) losses which would not be compensable under these sections regardless of the time of filing?

VII. Under the findings of fact set forth in the District Court's Memorandum Opinion on Plaintiffs' Motion for Partial Summary Judgment, entered April 28, 1999, in which the facts were viewed in the light most favorable to the defendants, does the defendants' conduct constitute an unfair or deceptive act in the conduct of any trade or commerce, as a matter of law, under SCUTPA, S.C.Code Ann. § 39–5–10 *et seq.?*

## FACTUAL/PROCEDURAL BACKGROUND

In June 1997, plaintiffs [1] brought this suit in state court alleging that defendants participated in operating video poker machines in a manner which violated state law. The causes of action asserted by the plaintiffs arise under the Racketeer Influenced Corrupt Organizations Act (RICO), the South Carolina Unfair Trade Practices Act (SCUTPA), and S.C.Code Ann. §§ 32–1–10 and 32–1–20 (recovery for gambling losses in excess of $50.00 at any one time or sitting). Because one of the plaintiffs' claims involved federal law (RICO), the defendants removed the action to federal court. However, the District Court also had to deal with several state law issues. In 1998, the District Court certified the following question to

---

1. Plaintiffs are a group of habitual gamblers who filed this action in an attempt to recover the losses they sustained on video poker machines owned or operated by the named defendants. The District Court has denied plaintiffs' motions for class certification.

this Court: "Do video poker machines violate South Carolina's constitutional ban on lotteries?" By a 3–2 vote, this Court held that video poker does not constitute a lottery. *Johnson v. Collins*, 333 S.C. 96, 508 S.E.2d 575 (1998).

In February 1999, plaintiffs moved for summary judgment against eight [2] of the defendants.[3] The District Court issued a Memorandum Opinion on April 28, 1999, granting plaintiffs' motion for partial summary judgment. The defendants' appealed. The Fourth Circuit Court of Appeals vacated the District Court's Order. *Johnson v. Collins Entertainment Co.*, 199 F.3d 710 (4th Cir.1999). The Fourth Circuit based its ruling on the federal courts' abstention doctrine established in *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and determined the District Court improperly ruled on unsettled issues of state law. The Fourth Circuit remanded the case with directions to stay plaintiffs' damage claims until the state court system could address the unresolved issues of state law.[4]

## LAW/ANALYSIS

I. **Does the ruling in *Video Gaming Consultants v. South Carolina Dep't of Revenue*, 342 S.C. 34, 535 S.E.2d 642 (2000), apply to the second phrase in S.C.Code Ann. § 12–21–2804(B) prohibiting the offering of *special* inducements or is that portion of the statute otherwise unconstitutional on its face?**

The defendants argue plaintiffs cannot rely on S.C.Code Ann. § 12–21–2804(B) as a "predicate act" for their RICO

---

**2.** Both plaintiffs' and defendants' briefs state the motion was made against eight defendants: Collins Entertainment Corp., Inc., Fred Collins, Jr., R.L. Jordon Oil Co., MHS Enterprises, Inc., Mickey Stacks, Pedroland, Inc., Ingram Investments, Inc., and Henry E. Ingram. The District Court Opinion, however, only refers to seven defendants.

**3.** Although the motion was directed at only seven or eight defendants, the District Court permitted briefing and argument by all of the defendants in the case because of the potential consequences to them of an adverse ruling.

**4.** The Fourth Circuit did not articulate which issues of state law it believed to be unsettled. Therefore, the District Court invited the parties to submit what they believed to be the material, unresolved issues of state law remaining in the case.

claim because in *Video Gaming Consultants, Inc. v. South Carolina Dep't of Revenue*, 342 S.C. 34, 535 S.E.2d 642 (2000), this Court declared *all* of section 12–21–2804(B) unconstitutional. We disagree. In *Video Gaming*, we limited our holding to the first clause of section 12–21–2804(B).

S.C.Code Ann. § 12–21–2804(B) provides as follows:

No person who maintains a place or premises for the operations of machines licensed under § 12–21–2720(A)(3) may advertise in any manner for the playing of the machines nor may a person offer or allow to be offered any special inducement to a person for the playing of machines permitted under § 12–21–2720(A)(3).[5]

 This section addresses two distinct topics. The first clause of the section provides for a ban on advertising the playing of gaming machines. The second clause of the section provides for a ban on the offering of "special inducements" to play video gaming machines. In *Video Gaming Consultants*, this Court addressed the constitutionality of section 12–21–2804(B). We identified the issue as follows: "Is the ban on advertising constitutional?" As we began our analysis, we quoted only the first phrase of the statute, observing: "This code section states: 'No person who maintains a place or premises for the operation of machines licensed under Section 12–21–2720(A)(3) may advertise in any manner for the playing of the machines.'" *Video Gaming Consultants*, 342 S.C. at 37–38, 535 S.E.2d at 644. This Court then analyzed the statute's constitutionality under the commercial speech test set forth in *Central Hudson Gas & Elec. Corp. v. Public Serv. Commn.*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Although this Court never made any reference to the second clause of subsection B, the defendants argue that the following statement which appeared at the end of our opinion indicates we declared the entire section unconstitutional: "In conclusion, we hold *the statute* does not meet the last two prongs in the *Central Hudson* test and thus *the statute* is unconstitutional." *Video Gaming Consultants*, 342 S.C. at 45, 535 S.E.2d at 648 (emphasis added). This is the basis for the Plaintiffs' claim that this Court's opinion in *Video Gaming Consultants* only addressed advertising, not the special in-

---

5. This section was repealed effective July 1, 2000.

ducement ban provided for in the second clause of section 12–21–2804(B). We agree with plaintiffs.

 This Court did not discuss the special inducement clause of section 12–21–2804(B) in its opinion. Furthermore, the First Amendment analysis in *Video Gaming Consultants* has no application to the special inducement clause since that portion of the statute does not involve protected commercial speech. Even if payout offers and jackpot displays were considered a form of advertising, offers of illegal payouts in excess of $125 would not be protected under the analysis of *Central Hudson* since such offers do not concern lawful activity and are inherently misleading. "For commercial speech to come within th[e First Amendment], it at least must concern lawful activity and not be misleading." *Video Gaming Consultants,* 342 S.C. at 40, 535 S.E.2d at 645 (quoting *Central Hudson,* 447 U.S. at 566, 100 S.Ct. at 2351, 65 L.Ed.2d 341). Therefore, since payouts in excess of $125 to a single player in a 24–hour period are illegal under S.C.Code Ann. § 12–21–2791 and *Gentry v. Yonce,* 337 S.C. 1, 12–13, 522 S.E.2d 137, 143 (1999), the advertisement of such payouts is not protected speech.[6]

Furthermore, our decision in *Video Gaming Consultants,* declaring the advertising portion of § 12–21–2804(B) unconstitutional, has no effect on the remaining provisions of the statute since the unconstitutional provision can be severed from the remainder of the statute. This Court recently addressed severability in *Joytime Distribs. & Amusement Co. v. State,* 338 S.C. 634, 528 S.E.2d 647 (1999) stating:

The test for severability is whether the constitutional portion of the statute remains complete in itself, wholly inde-

---

**6.** We agree with the language of Judge Anderson, as stated in his Order of Certification. "[T]he South Carolina Supreme Court addressed the constitutionality of at least certain aspects of S.C.Code Ann. § 12–21–2804(B) in *Video Gaming Consultants* .... The South Carolina Supreme Court quoted and expressly addressed only the first phrase in that section which relates to advertising, which it ultimately found to be unconstitutional. It did not discuss or address the second phrase which relates to special inducements. Further, the court's rationale as to why advertising of legal activity could not be banned would not appear to apply to that portion of the statute prohibiting 'special inducements,' at least to the extent the term 'special' is construed to include enticements otherwise prohibited by law."

pendent of that which is rejected, and is of such a character that it may fairly be presumed that the legislature would have passed it independent of that which conflicts with the constitution. "When the residue of an Act, sans that portion found to be unconstitutional, is capable of being executed in accordance with the Legislative intent, independent of the rejected portion, the Act as a whole should not be stricken as being in violation of a Constitutional Provision." *Id.* at 649, 528 S.E.2d at 654 (internal citations omitted) (quoting *Dean v. Timmerman,* 234 S.C. 35, 43, 106 S.E.2d 665, 669 (1959)). Section 12–21–2804 meets this test. The special inducement language is an independent clause. Neither provision depends on the other. In addition, the legislative intent behind South Carolina's Video Game Machines Act ("VGMA") was to limit gambling; therefore, this Court can presume the legislature would have passed the special inducement ban independent of the ban on advertising.

For the aforementioned reasons, we declare that in *Video Gaming Consultants,* this Court did not find all of section 12–21–2804(B) unconstitutional. Therefore, we affirmatively hold the following portion of the statute is not unconstitutional and was not affected by this Court's decision in *Video Gaming Consultants:* "nor may a person offer or allow to be offered any special inducement to a person for the playing of machines permitted under § 12–21–2720(A)(3)."

## II. Would S.C.Code Ann. § 12–21–2804(B) be unconstitutional as applied, if construed to prohibit the offering of cash payouts in excess of $125?

The defendants argue Section 12–21–2804(B) would be unconstitutional as applied if a court construed the prohibition on special inducements to include offers of payouts in excess of the $125 limit. We disagree. The defendants argue section 12–21–2804(B) is ambiguous, vague, and offends due process. They argue the statute did not give them "fair warning" that their conduct in advertising jackpots over $125 would be considered a "special inducement," prohibited by the statute. They argue that until this Court's opinion in *Gentry v. Yonce* was published, they had no notice that jackpot displays could be considered special inducements. They further contend that without notice their actions were in violation of the law, they

cannot be held criminally responsible. Finally, defendants argue section 12–21–2804 violates procedural due process because the statute does not afford procedures for a finding of wilfulness or an opportunity for the accused to be heard on the question of wilfulness.[7] We find defendants' arguments are without merit.

"When the issue is the constitutionality of a statute, every presumption will be made in favor of its validity and no statute will be declared unconstitutional unless its invalidity appears so clearly as to leave no doubt that it conflicts with the constitution." *State v. Jones*, 344 S.C. 48, 58, 543 S.E.2d 541, 546 (2001) (citations omitted). This general presumption of validity can be overcome only by a clear showing the act violates some provision of the constitution. *Main v. Thomason*, 342 S.C. 79, 535 S.E.2d 918 (2000); *State v. Brown*, 317 S.C. 55, 451 S.E.2d 888 (1994); *see also Westvaco Corp. v. South Carolina Dep't of Revenue*, 321 S.C. 59, 467 S.E.2d 739 (1995).

### A. Ambiguity and Vagueness

The established test for vagueness is whether the statute provides "fair notice to those to whom the law applies." *Main*, 342 S.C. at 92, 535 S.E.2d at 925. A statute is not vague if a "person of ordinary intelligence seeking to obey the law will know, and is sufficiently warned of, the conduct the statute makes criminal." *Curtis v. State*, 345 S.C. 557, 572, 549 S.E.2d 591, 598 (2001). However, due process prevents courts "from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266, 117 S.Ct. 1219, 1225, 137 L.Ed.2d 432 (1997). This Court, in *Gentry v. Yonce*, did not announce a novel interpretation of section 12–21–2804(B) since the language of the statute gave sufficient notice to defendants that their conduct in offering jackpots in excess of $125 could be considered a "special inducement."

As noted previously, the relevant portion of section 12–21–2804(B) provides, "nor may a person offer or allow to be

---

7. Under section 12–21–2804(F), violations of subsection (B) are subject to prosecution only if the Department of Revenue (DOR) determines the violation was wilful.

offered any special inducement to a person for the playing of machines permitted under section 12–21–2720(A)(3)." The term "special inducement" clearly prohibits offering players any form of enticement to gamble beyond the implicit attraction of providing a game with the potential for winnings not to exceed $125 per day. The modifier "special" describes any enticement to gamble on video poker machines beyond the prospect of winning up to $125 per day. Admittedly, the statute itself does not contain a separate definition of the term "special inducement." However, due process does not require every word in a statute to be defined. *Main,* 342 S.C. at 92–93, 535 S.E.2d at 925. The term "special inducement" has enough of a "common, ordinary meaning sufficient to proscribe conduct." *Curtis,* 345 S.C. at 572, 549 S.E.2d at 599.

Furthermore, although the statute itself does not define "special inducement," the regulations of DOR do clarify the term. 27 S.C.Code Reg. 117–190.1 provides:

[A]ny attempt to influence a person to play video game machines is an inducement and is strictly prohibited by the statute. A location will be subject to the various civil or criminal penalties imposed by the statute for offering any of the following inducements:

1. Free or discounted food or beverages,
2. Free or discounted games,
3. Prizes, either at the doors or through drawings or other means,
4. Coupons offering any of the above
5. Cash, or
6. Any other valuable consideration

*The above list of inducements is not all inclusive. Any other attempts to influence a person to play a video game machine will also be subject to the various civil or criminal penalties imposed by the statute.*

*Id.* (emphasis added). Illegal payouts fall within the category of "other attempts to influence a person to play a video game machine."

In conclusion, our decision in *Gentry* was not a novel construction of a vague or ambiguous criminal statute so as to raise the due process concerns discussed in *United States v. Lanier.* In *Gentry,* this Court applied the straight-forward,

plain meaning of section 12–21–2804(B) holding "advertising or offering of jackpots could be construed as a special inducement . . . ." *Gentry,* 337 S.C. at 11, 522 S.E.2d at 142. Therefore, defendants have not met their burden of showing the statute is unconstitutionally vague or ambiguous.

### B. Procedural Due Process

█ Defendants argue that section 12–21–2804(F)'s wilfulness requirement offends procedural due process. We disagree. Section 12–21–2804(F) provides, in relevant part:

> A person violating subsections (A), (B), (D), or (E) of this section is subject to a fine of up to five thousand dollars to be imposed by the department. The department, upon a determination that the violation is wilful, may refer the violation to the Attorney General or to the appropriate circuit solicitor for criminal prosecution, and, upon conviction, the person must be fined not more than ten thousand dollars or imprisoned not more that two years, or both.

Defendants argue section 12–21–2804 is unconstitutional on its face because it does not afford procedures for a finding of wilfulness by the DOR nor does it provide the accused an opportunity to be heard on the question of wilfulness before the DOR makes its determination. A defendant has a full opportunity to be heard on the issue of wilfulness, just as any criminal defendant may raise issues of intent: by the procedures provided by the South Carolina criminal justice system, which include indictment, preliminary hearings, and trial by jury. The determination of wilfulness by the DOR simply starts the criminal process, just as a solicitor's determination of criminal intent triggers a decision to prosecute.

### III. Is the special inducement prohibition in S.C.Code Ann. § 12–21–2804(B) applicable to persons who do not themselves "maintain a place or premises," but instead lease machines to others who "maintain a place or premises" on a basis which results in the sharing of profits and under circumstances in which the lessor is aware of the activities which violate section 12–21–2804(B) and, despite that knowledge, accepts profits from the operation of the machines at issue?

Section 12–21–2804(B), in its entirety provides:

> No person who maintains a place or premises for the operation of machines licensed under § 12–21–2720(A)(3) may advertise in any manner for the playing of the machines nor may a person offer or allow to be offered any special inducement to a person for the playing of machines permitted under § 12–21–2720(A)(3).

The first phrase in S.C.Code Ann. § 12–21–2804(B), which was declared unconstitutional in *Video Gaming Consultants,* expressly applies to any "person who maintains a place or premises for the operation of machines licensed under Section 12–21–2720(A)(3)." The second phrase, which contains the inducement prohibition, refers only to "a person." The defendants, who lease machines to third parties but do not themselves "maintain a place or premises," argue the language in the first phrase precludes application of the statute to them, regardless of their knowledge of, involvement in, and acceptance of profits from the actual operation of machines. We disagree.

As discussed earlier, the two clauses of section 12–21–2804(B) are separate, independent clauses. The special inducement portion of the statute clearly states it apples to "a person" and does not contain the modifier "who maintain[s] a place or premises for the operation of machines" as does the earlier portion prohibiting advertising. Therefore, the lessor defendants are "a person" and are therefore prohibited from making or allowing to be made special inducements, even if the lessor defendants did not physically maintain or own the premises where the machines were located.

Furthermore, we agree with the following language from the District Court's Memorandum Opinion which held the lessor defendants responsible for the special inducement of jackpots and excessive payoffs because they programmed the machines and set the paytables to make the illegal offers. Judge Anderson wrote:

> As the facts clearly demonstrate, all defendants either operate the machines directly or through lease arrangements which result in the splitting of profits. For the "profits" to be determined, the lessor must know what cash amounts are paid out. This is determined either by blindly taking the word of the location operator, which no lessor suggests to be

its practice, or by reconciling the machines' records which include, most significantly, what are alternately referred to as "payout tickets," "pay tickets" or "vouchers." Any reasonable review of these documents would demonstrate how payouts are being made. Thus, it is beyond dispute that the defendants who are lessors and who split profits with locations have the means of knowledge of how payouts are made at the locations and are chargeable with actual knowledge. Only willful blindness would prevent actual knowledge.

In this regard, one lessor defendant suggested that its role was nothing more than the equivalent of an automobile manufacturer who designed a car capable of going 120 mph. This defendant argued that it was the location that decided how fast to go. This analogy must be rejected. It is this lessor who is responsible for all aspects of the machines' actual functioning including what jackpot is displayed and how payout tickets are produced. This defendant settles up with the location by determining profits which, in turn, are determined or confirmed using the machines' own records. In short, a better analogy would be that this defendant sets the cruise control at 120 mph, rather than merely designing a car capable of going 120 mph.

 Therefore, even if this Court chose to interpret the second clause of section 12–21–2804(B) to include the modifier "who maintain[s] a place or premises for the operation of machines," the lessor defendants would still be liable under the "hand of one is the hand of all" theory. "When two or more persons aid, abet and encourage each other in the commission of a crime, all being present, each is guilty as a principal." *Yates v. Aiken*, 290 S.C. 231, 236, 349 S.E.2d 84, 87 (1986), *rev'd on other grounds, Yates v. Aiken*, 484 U.S. 211, 108 S.Ct. 534, 98 L.Ed.2d 546 (1988) (*citing State v. Hicks*, 257 S.C. 279, 185 S.E.2d 746 (1971)); *see also State v. Langley*, 334 S.C. 643, 648, 515 S.E.2d 98, 101 (1999) ("Under [the hand of one, the hand of all] theory, one who joins with another to accomplish an illegal purpose is liable criminally for everything done by his confederate incidental to the execution of the common design and purpose."). As discussed in the District Court's Memorandum Opinion, the lessor defendants aided, abetted, and definitely encouraged the lessees of the machines to ignore the $125 limit and to advertise jackpots in

excess of the limit. The defendants had exclusive control over how the machines were programmed and set up, such as setting the jackpot displays and printing multiple payout tickets. The defendants shared in the illegal profits with knowledge of the unlawful operation of the machines. Therefore, the lessor defendants would be liable under either interpretation of the statute.

In conclusion, this Court finds the special inducement provision of section 12–21–2804(B) applies to *any* person, not just a person who "maintains a place or premises" for the operation of the machines.

**IV. Under the findings of fact set forth in the District Court's Memorandum Opinion on Plaintiffs' Motion for Partial Summary Judgment, entered April 28, 1999, in which the facts were viewed in the light most favorable to the defendants, is the defendants' conduct in offering or allowing to be offered, the payment of sums in excess of $125 for credits accumulated on a video gambling machine subject to prosecution under S.C.Code Ann. § 12–21–2804(F) as the unlawful offering of a special inducement to gamble as prohibited by Section 12–21–2804(B)?**

The defendants argue that offering or allowing to be offered payouts in excess of $125 per day is not a "special inducement" as prohibited by section 12–21–2804(B), and therefore cannot serve as a predicate act under RICO. We disagree.

This Court already decided this issue in *Gentry v. Yonce*, 337 S.C. 1, 522 S.E.2d 137 (1999), although the language used by the Court was not mandatory. This Court stated, "At this stage in the proceedings, we think that the advertising or offering of jackpots could be construed as a special inducement and thus could support a RICO claim." *Id.* at 10, 522 S.E.2d at 142. This Court's use of the phrases "at this stage in the proceedings," "we think," and "could be construed" was not an expression of equivocation or uncertainty but was merely in recognition of the procedural posture of the case. The circuit court in *Gentry* dismissed the case for failure to state a claim, and the plaintiffs appealed. Therefore, the case which came before this Court had not been developed factually

before the lower court, and thus we were only asked to decide whether the plaintiffs had *stated* a claim, not whether they had *proved* their claim.

Furthermore, this Court made the following statement in *Gentry* about the exact case now before this Court: "The United States District Court held similarly in *Johnson v. Collins* ... that the $125 payout limit is $125 per 24–hour period and alleged violations of §§ 12–21–2804(A) and (B) can serve as predicate acts in a RICO cause of action .... [T]he District Court's ruling and analysis on the above issues are consistent with our opinion." *Gentry,* 337 S.C. at 13, n. 18, 522 S.E.2d at 143, n. 18. This statement further shows that the language used by this Court was not an expression of equivocation or uncertainty but merely in recognition of the procedural posture of the case.

▮▮▮ We reaffirm our holding in *Gentry* that the offering or advertising of jackpots in excess of $125 is a special inducement in violation of section 12–21–2804(B), subject to prosecution under subsection F.

V. **While the general operation of the devices at issue was authorized by law during all times at issue, and while South Carolina law generally exempts the operation of the devices at issue from statutory penalties under the state's criminal laws relating to gambling, would the activity alleged nonetheless become "a gambling business which is a violation of the law of [the] State" of South Carolina if defendants are proven to have routinely offered and made payouts in excess of that allowed by state law or to have created fraudulent records to disguise the making of such payouts?**

▮▮▮ Plaintiffs argue that, although video poker was a legal business in South Carolina, because defendants routinely violated the Video Gaming Machines Act, they were conducting an "illegal gambling business" in violation of the law of South Carolina for purposes of 18 U.S.C. § 1955 (RICO). We agree.

18 U.S.C. § 1955 provides, in relevant part:

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an *illegal gambling business* shall be fined under this title or imprisoned not more than five years, or both.

(b) As used in this section—

(1) *"illegal gambling business"* means a gambling business which—

(i) *is a violation of the law of a State* or political subdivision in which it is conducted

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

*Id.* (emphasis added). Defendants argue that since video poker was, at all times at issue, a legal business in this state, they cannot be in violation of this statute.[8] We disagree. Even though video poker was a legal gambling business, it could *become* an illegal gambling business if it was operated in a manner which violated VGMA. Section 12–21–2710 makes gambling devices generally illegal, except for those video game machines "which meet the technical requirements provided for in sections 12–21–2782 and 12–21–2783." Therefore, if the video poker business did not fall within the express license of the law, it would *not* be "a legal gambling business." If a person operated his video poker machines in violation of the limits set forth in VGMA, and if those violations carried criminal penalties under South Carolina law, then that person has conducted an "illegal gambling business ... [in] violation of the law of [South Carolina]."

If defendants are proven to have routinely offered and made payouts in excess of that allowed by state law or to have created fraudulent records to disguise the making of such

---

**8.** Under defendants' reasoning, a pharmaceutical business could sell controlled substances to people without proper prescriptions but still be a "legal business" under state law.

payments, then they were operating an illegal gambling business in violation of the law of this state.

> **VI. Does the availability of a remedy under S.C.Code Ann. §§ 32–1–10 and 32–1–20 for certain gambling losses preclude plaintiffs from seeking recovery under other state law theories for: (a) losses which are compensable under these sections if timely filed; or (b) losses which would not be compensable under these sections regardless of the time of filing?**

Defendants argue S.C.Code Ann. §§ 32–1–10 and 32–1–20 [9] provide the exclusive remedy for gambling losses, and, therefore, the plaintiffs are precluded from seeking recovery under other state law theories. We disagree.[10]

 The Court of Appeals correctly ruled on this issue in *Justice v. Pantry*, 330 S.C. 37, 496 S.E.2d 871 (Ct.App.1998), *aff'd as modified*, 335 S.C. 572, 518 S.E.2d 40 (1999).[11] The Court of Appeals held:

---

**9.** Sections 32–1–10 and 32–1–20 were originally adopted in 1712 as a part of the Statutes of Anne. Section 32–1–10 allows a person who has lost $50.00 or more gambling in one sitting to sue the winner to recover the losses, provided he brings suit within ninety days of the loss. If the person who lost money gambling does not bring suit within the ninety days, section 32–1–20 allows any person to bring suit against the winner for treble damages within one year of the date of the loss, provided the suit is brought without covin or collusion.

**10.** Judge Anderson, in his Order of Certification made the following statement concerning this issue: "This court was initially inclined to deny certification of this question for three reasons. First, the strict liability under Sections 32–1–10 and 32–1–20 would appear to be intended only to expand relief otherwise available. Second, the remedy under SCUTPA is expressly made cumulative to any other available remedies. Third, the South Carolina Supreme Court's opinion in *Gentry v. Yonce*, while not addressing the question directly, is inconsistent with any interpretation of the statutory remedies to preclude other claims if their additional elements can be proven." We agree with Judge Anderson's initial hesitation to deny certification on this issue.

**11.** This Court affirmed as modified the Court of Appeals in this case. However, the relevant issue from *Justice* was not appealed to this Court, and therefore was not discussed in this Court's opinion.

After careful consideration, we conclude section 32–1–20 was not impliedly repealed by enactment of the Video Game Machines Act, specifically section 12–21–2791, because these statutes are not repugnant to each other and are not incapable of a reasonable reconcilement. To the contrary, these statutes are consistent. Both statutes promote the same goal of limiting excessive gambling.

Sections 32–1–10 and 20 promote "a policy which prevents a gambler from allowing his vice to overcome his ability to pay. The legislature adopted a policy to protect a citizen and his family from the gambler's uncontrollable impulses." ... This policy is furthered by allowing a gambler to recover excessive gambling losses or another person to recover the losses if the gambler fails to do so. Likewise, the clear intent of section 12–21–2791 is to prevent excessive gambling by limiting the amount of cash payouts for winnings on video poker machines. Each advances the same policy of limiting excessive gambling losses through different means; sections 32–1–10 and 20 prevent excessive gambling losses and section 12–21–2791 prevents excessive gambling winnings.

*Id.* at 44, 496 S.E.2d at 875 (internal citations omitted). There is nothing in sections 32–1–10 and 20 to indicate the legislature intended to limit relief otherwise available. These statutes were passed in 1712, and we cannot hold that they were intended to pre-empt all future remedies for persons injured by unlawful gambling activities.

With respect to plaintiffs' claims under SCUTPA, sections 32–1–10 and 20 do not have any preclusive effect. In fact, S.C.Code Ann. § 39–5–160 provides: "The powers and remedies provided by this article shall be cumulative and supplementary to all powers and remedies otherwise provided by law." Further, this Court's opinion in *Gentry* clearly envisions that both remedies would be available to the plaintiffs. In *Gentry,* this Court addressed sections 32–1–10 and 20 as well as other state law claims. Nothing in our opinion would indicate sections 32–1–10 and 20 were the sole causes of action available to plaintiffs.

**VII. Under the findings of fact set forth in the District Court's Memorandum Opinion on Plaintiffs' Motion for Partial Summary Judgment, entered April 28, 1999, in which the facts were viewed in the light most favorable to the defendants, does the defendants' conduct constitute an unfair or deceptive act in the conduct of any trade or commerce, as a matter of law, under SCUTPA, S.C.Code Ann. § 39–5–10 *et seq.*?**

We find the District Court judge, in his Memorandum Opinion, correctly interpreted South Carolina's Unfair Trade Practices Act. Therefore, since Judge Anderson correctly interpreted South Carolina law on this matter, the following analysis is quoted directly from the District Court's Memorandum Opinion. We adopt Judge Anderson's analysis.

The South Carolina Unfair Trade Practices Act makes it unlawful to engage in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C.Code Ann. § 39–5–20 (1985). "An act is 'unfair' when it is offensive to public policy or when it is immoral, unethical, or oppressive; a practice is 'deceptive' when it has a tendency to deceive." S.C. Law of Torts at 372 (*quoting Young v. Century Lincoln–Mercury, Inc.,* 302 S.C. 320, 396 S.E.2d 105, 108 (Ct.App.1989) *affirmed in part, reversed in part, on other grounds,* 309 S.C. 263, 422 S.E.2d 103 (1992) (*per curium* )).

Private causes of action for violation of this statute are authorized by S.C.Code Ann. § 39–5–140 (1985), which provides for treble damages and "such other relief as [the court] deems necessary or proper" when willful violations are found and for actual damages and attorneys fees and costs in any case resulting in a finding of violation of the statute. The statute is not, however, applicable to "[a]ctions or transactions permitted under laws administered by any regulatory body or officer acting under statutory authority of this State or the United States or actions or transactions permitted by any other South Carolina State law." S.C.Code Ann. § 39–5–40(a) (1985).

This "regulated industry" exception was addressed in *State ex rel McLeod v. Rhoades,* 275 S.C. 104, 267 S.E.2d 539 (1980), which held that "[i]nitially, the burden is on the

party seeking the exemption to demonstrate [that the transactions at issue are regulated]. Once the exemption is demonstrated, the complainant must then show that the specific act in question does not come within the exemption." *Rhoades,* 267 S.E.2d at 541 (finding securities transactions to fall within the exemption). This holding was later applied by the South Carolina Court of Appeals to exempt any transaction if the general activity was regulated. *See Scott v. Mid Carolina Homes,* 293 S.C. 191, 359 S.E.2d 291 (Ct.App.1987) *overruled by Ward [v. Dick Dyer and Assoc., Inc.,* 304 S.C. 152, 403 S.E.2d 310 (1991) ].

Because the industry at issue is regulated under the Video Game Machine Act, one group of defendants argued that any action for redress could only be brought by the South Carolina Attorney General who has, as noted above, now declined to pursue any ruling from this court, except as to the lottery issue. This argument appears to be based on the "general activity" analysis used in *Rhoades* and *Scott.*

The "general activity" test announced in *Rhoades* was, however, later rejected by the South Carolina Supreme Court in *Ward v. Dick Dyer and Associates, Inc.,* 304 S.C. 152, 403 S.E.2d 310 (1991). That court explained as follows:

> After much research and consideration of the events concerning the regulation of businesses during the ten years since the *Rhoades* decision, we believe that a "general activity" test would not fulfill the intent of the Legislature in prohibiting unfair trade practices. We believe that the exemption is intended to exclude those actions or transactions which are allowed or authorized by regulatory agencies or other statutes.... [W]e believe that the intent of our Legislature was to exclude activities which would otherwise be allowed or authorized.

*Ward,* 403 S.E.2d at 312. Some of the defendants previously argued based on *Ward* that the allegedly wrongful conduct is not only strictly regulated by the State, but has also been specifically permitted by statute and the Department of Revenue. As discussed above in regard to the interpretation of Section 2791, there is no support for this contention. The law does not allow for the payment of more than $125 at the conclusion of play. While the cap may have been poorly enforced, there is no showing that any relevant

state agency or authority has done anything to suggest that the law means anything other than what this court has concluded it means. Defendants cannot, therefore, find protection in the "regulated activity" exemption of the SCUTPA.

In this motion, plaintiffs assert that they are entitled to partial summary judgment that certain specified defendants' practices in regard to offering and making cash payouts in excess of those allowed by Section 2791 constitute unfair or deceptive practices as prohibited by SCUTPA. This court finds that these defendants' activities violate SCUTPA in various respects.

First, because there is a statutory limit on the amount which can be paid out, the offering of "jackpots" in excess of this limit is inherently misleading unless clarification is provided. This is because the display of a jackpot without an equally clear and visible explanation of any qualification on payout suggests not only that the payment is perfectly legal but that it will be paid, if won, without further conditions.[12] To the extent any player learns of the illegality or conditions on payout at a later time, there is an inherent misrepresentation.

Moreover, and perhaps more importantly, the payment of cash in excess of the statutory cap is necessarily a violation of the public policy of this state as expressed in the state's statutes. The operators also engage in unethical behavior by devising a variety of schemes to evade detection of the violations. This includes any device which purports to make payments over a series of days, the payment to proxies or to players under names known by the operator to be false, the use of facially invalid "trust" agreements, or any other scheme to evade the limit or detection. These attempts at evasion are made more, not less, egregious by some of the defendants' attempts to shift blame to the payees. The latter is accomplished by encouraging the players to sign

---

12. At least one defendant conceded that players have occasionally [sic] balked when asked to sign a form stating that the payout is not more than $125 over what was put in. It does not, however, appear that these players are among the moving plaintiffs.

documents that the defendants cannot in good faith believe to be true or valid.[13]

The degree of repetition and thus "public impact" is extraordinary. The record suggests that these practices are engaged in daily by the defendants or others acting for the mutual benefit of the defendants and themselves.[14] At best, they argue ignorance. Defendants offer nothing to counter the evidence that violation of the law is the routine practice. Indeed, the suggestion is not that the practices are infrequent but that they are so frequent, common, and pervasive in that no operator can compete in this industry without violating the law. To the extent this may be offered as an excuse, any such defense is rejected.[15]

There is evidence in the record that the present plaintiffs have suffered some harm as a result of these unfair trade practices. The degree of harm and level of causation is, however, particularly hard to define as each player was drawn to the machines initially for a variety of reasons and continued (or continues) to play for a variety of reasons. This court will not, therefore, make a determination as to the extent of damages or causation. That must be reserved

13. On this point, defendants suggest an *in pari delicto* defense. The translation ends the inquiry—the phrase means "in equal fault." The operators and machines at issue are licensed to operate in a regulated area of the law. They should, therefore, be held to a greater knowledge and understanding of the laws than their customers, particularly where the laws are designed to protect the player from his or her own bad judgment. In any case, what the law prohibits is the *making* of the payouts in excess of the statutory cap. It does not directly address the *receipt* of the funds. Thus, while this court is not willing to suggest that the player who receives an excess payment is without fault, the fault or culpability is certainly not "equal."

14. This court has reached this conclusion without deciding if the lessor defendants engage in "joint ventures" with their lessees. The clear evidence of involvement, knowledge and profit from the prohibited activity is enough to hold all defendants responsible for the resulting unfair and deceptive activities.

15. This court cannot condone such a defense any more than it could condone a defense by a respected physician that it was necessary to "pad the medicare bills" or offer patients unnecessary narcotic prescriptions to remain competitive. What is necessary to compete can never be defined in terms of keeping up with competitors who are themselves in violation of the law.

for the jury. This does not, however, preclude the court from rendering partial summary judgment on the legal issue whether the complained of acts constitute unfair trade practices. The practices are so flagrant and obviously violative of public policy and so fraught with deception and unfairness that this court cannot but conclude that they constitute unfair trade practices as a matter or law.

**Certified Questions Answered.**

TOAL, C.J., MOORE, BURNETT, JJ., and Acting Justices GEORGE T. GREGORY, JR., and C. VICTOR PYLE, JR., concur.