THIS OPINION HAS NO PRECEDENTIAL VALUE.  IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 239(d)(2), SCACR.
THE STATE OF SOUTH CAROLINA
In The Court of Appeals
Michael G. Phillips, Andre Sullivan, Tywanna Kithcart, Samuel Gallishaw, Latesia Brinson, Jameta Wheeler, Chasity McClam, Chasie McClam, Ramona Banks, Christopher Adams, Amithy Merrill, Mark Dudley, Reginald Ray, Sandy Rogers, Nicole Sims, Luciana White, Janell Branch, Chauncey Black, Gregory Gartrell, Tamara Elliott, Monifa Drayton, Talisha Brown, Nadya Brown, Randy Brantley, Keshia Oliver, Crystal Mack, Devonna McCray, Angela Holland, Willie S. Trappier, Delane Mitchell and Neva Gray, Appellants,

 v.
 South Carolina State University, Rheem Manufacturing Co., Inc., and Honeywell, Inc., Defendants, of whom Honeywell, Inc., is, Respondent.

  
 

Appeal From Orangeburg County
James C. Williams, Jr., Circuit Court Judge

Unpublished Opinion No. 2005-UP-320
Submitted March 1, 2005  Filed May 12, 2005

AFFIRMED

 
 
 
 Brenda Reddix-Smalls, of Columbia, for Appellants.
 Jeannine L. Lee and Patrick R. Martin, of Minneapolis, MN; and Phillip Florence and Thomas Gottshall, of Columbia, for Respondent.
 
 
 

PER CURIAM: In this product liability case, Appellants are students of South Carolina State University (SCSU) who were injured when a water heater began emanating carbon monoxide.  Appellants brought an action against the university and the manufacturers of the water heater before settling these claims.  Honeywell, Inc., the supplier of one of the components of the hot water heater, remained as the lone defendant.  Appellants asserted numerous theories of liability and the trial judge granted summary judgment.  We affirm.[1]
FACTS

On August 29, 1998, a water heater issued toxic fumes into a dormitory that killed one student in an adjacent room and affected several other students.  Tests conducted shortly after the incident indicated concentrations of carbon monoxide were present in the room where the water heater was located and in the dormitory rooms in the immediate vicinity.  
Rheem Manufacturing Co., Inc. manufactured the water heater while SCSU installed and maintained it.  The water heater design included an energy saving damper that closed the flue opening when the water heater was not in operation.  The damper consisted of a metal flap at the top of the water heater that was designed to open prior to burner operation to allow the combustion products to vent.  Rheem manufactured the damper assembly.  The damper was attached by a rod to a damper actuator motor which powered the damper to open and close.  Honeywell supplied the actuator motor, a Honeywell model M892, and a small arrow coupler clip to Rheem.    
Because of the danger of carbon monoxide production, the damper assembly was required to have a backup mechanism to ensure that the damper opened when the water heater was on in case of motive power failure or deenergization of the vent damper device.  Although Honeywell also manufactured a complete damper assembly that incorporated such a failsafe mechanism, the D892, Rheem did not use this product.  Instead, Rheem designed its own damper assembly and incorporated only the M892 actuator motor from Honeywell.  
When Honeywell originally designed D892, it incorporated a return spring to pull the damper to a fully open position.[2]  The D892 was certified for compliance with applicable industry standards.  
Honeywell subsequently decided to sell the actuator motor separately to manufacturers who wanted to build their own damper assemblies.  The M892 was a motor that caused a ninety degree rotation of a shaft which was a standard item that could be used in a variety of applications.  Appellants expert testified that the M892 was a proven product with a history of manufacture of around a hundred thousand units and that as a stand-alone component, it was a functional motor that satisfie[d] the intent of [industry] specifications.  Appellants expert further agreed that the M892 by itself was safe.  
 Because the M892 could be used to power a damper assembly, Honeywell provided a warning label notifying purchasers that the completed damper assembly would need a failsafe device to open the damper.  The original warning label specified a spring for this purpose, similar to the design of the D892.  The warning label was Honeywells only means of insuring the safety of the final product.  
When Rheem designed its damper, however, Rheem elected not to use a spring.  Rheem made this decision in order to avoid using moving parts and because of concerns that the spring could be subject to corrosion or tampering and therefore elected to use a counterweight instead.  
During the design phase, Rheem and Honeywell discussed certain problems with the application.  One difficulty was that the damper, incorporating the Honeywell motor, would not close all the way.  Engineers from Rheem and Honeywell met and determined that Honeywells motor was not at fault.  Instead, parts of the damper assembly were interfering with each other to prevent closure.  Later, Rheem requested that the warning label be changed to reflect its decision to use a counterweight.  Honeywell approved the change, realizing that alternate means of accomplishing the purpose served by the spring existed.  The warning labels shipped to Rheem called for a return mechanism instead of a return spring to serve as a failsafe device.  
Once these problems were resolved, Honeywell approved the application.  Rheem then sought and obtained American Gas Association (AGA) certification of the complete water heater.  AGA used test data on the M892 from Honeywells D892 certification to complete the test report.  Honeywell did not test the final damper assembly because the testing was performed by Rheem. 
Appellants experts attributed the release of the carbon monoxide to three main factors: (1) improper maintenance and installation of the water heater; (2) improper design of the water heater which allowed condensation to drip on the burner; and (3) incomplete venting due to a faulty damper assembly.  Since Rheem and SCSU are no longer parties to this action, the only remaining issues relate to the damper assembly.
When the responding public agencies arrived to test the water heater the morning after the incident, they saw SCSU employees leaving the utility room carrying duct tape and hand tools.  The responding officials were concerned because the utility room was supposed to have been a taped-off secure area.  SCSU employees admitted they found the damper assembly disconnected from the motor and tried unsuccessfully to reattach it with duct tape.  They could not connect the parts because a coupler was missing.  
Honeywells expert testified that the damper assembly had been intentionally disconnected because the connecting rod was bent and the motors holding Honeywells motor in place were either missing or loose.  With the motor disconnected, the damper was found in a half-open position, roughly two to three oclock, rather than a twelve oclock position.  
Appellants expert testified that the damper had been disconnected [w]ithin a couple hours of the incident.  He further testified that the dampers half-open position produced decreased draft, and was thus one of the contributing causes of the carbon monoxide production.  
The day after the incident occurred, SCSUs Police Department measured carbon monoxide levels in the dormitory rooms.  The results established the presence of the gas, but only in the immediate vicinity of the water heater.[3]  Police also found carbon monoxide levels on the outside of the building across from the water heater room.  Appellants expert testified that carbon monoxide could have spread throughout the building through the ventilation system.  However, none of Appellants experts did any testing on SCSUs ventilation to verify their theories.  Additionally, one of their experts testified he could not opine that it was more probable than not that carbon monoxide spread throughout the building.  
The amended complaint alleges six causes of action against Honeywell, including negligence, intentional infliction of emotional distress, unfair trade practices, tortious interference with contract, product liability and breach of warranty claims.  After a lengthy discovery, Honeywell moved for summary judgment on all claims.  The trial court granted Honeywells motion.  This appeal follows. 
STANDARD OF REVIEW

Summary judgment is appropriate when it is clear there is no genuine issue of material fact and the conclusions and inferences to be drawn from the facts are undisputed.  McClanahan v. Richland County Council, 350 S.C. 433, 437, 567 S.E.2d 240, 242 (2002).  Additionally, in ruling on a motion for summary judgment, a reviewing court must view the evidence in the light most favorable to the non-moving party.  Id. at 438, 567 S.E.2d at 242. 
LAW/ANALYSIS

I. Product Liability Claims
To establish a product liability claim under both negligence and strict liability theories, a plaintiff must show (1) that he was injured by the product; (2) that the product, at the time of the accident, was in essentially the same condition as when it left the hands of the defendant; and (3) that the injury occurred because the product was in a defective condition unreasonably dangerous to the user.  Allen v. Long Mfg. NC, Inc., 332 S.C. 422, 426, 505 S.E.2d 354, 356 (Ct. App. 1998).  Under a negligence theory, a plaintiff must additionally demonstrate that the defendant seller or manufacturer failed to exercise due care with respect to safety in the products design.  Id. at 426-27, 505 S.E.2d at 356.  
A. Defective Design
Appellants first assert that Honeywells M892 was defective due to a flaw in its design.  Honeywell defends on the ground that, as the component manufacturer of the M892 only, it should not be liable for the design flaws of the entire Rheem damper assembly.  Although Appellants claim that the M892 was defective, there is no evidence in the record that the M892 itself failed.  Appellants expert admitted that the M892, as a standalone unit, was safe.[4]  Therefore, the trial court correctly found that the M892 itself was not defective.
South Carolina courts have not addressed the liability of the manufacturer of a nondefective component for design defects in the final product.  Generally, a manufacturer of a component part is not liable for injuries caused by the component when it is incorporated into a finished product by a third party where the component in and of itself was not unreasonably dangerous at the time it left the component manufacturers control.  63 Am. Jur. 2d Products Liability § 147 (2004).
Furthermore, a component part manufacturer generally has no duty to analyze the safety of a completed product that incorporates its nondefective component part.  Childress v. Gresen Mfg. Co., 888 F.2d 45 (6th Cir. 1989).  Imposing such a duty would require component part manufacturers to guarantee the safety of other manufacturers machinery.  Crossfield v. Quality Control Equip. Co., 1 F.3d 701, 704 (8th Cir. 1993).  
The only exception to this rule occurs when the component manufacturer substantially participates in the integration of the component into the design of the final product.  See Restatement (Third) of Torts: Products Liability § 5(b)(1).  Courts usually determine whether the component manufacturer substantially participated in the final design by asking whether the seller had control over the design of the completed product.  See e.g. Jacobs v. E.I. du Pont de Nemours & Co., 67 F.3d 1219, 1242 (6th Cir. 1995).  A component manufacturer that merely designs a component to its buyers specifications does not substantially participate for products liability purposes.  Restatement (Third) of Torts: Products Liability § 5 cmt. e.  Moreover, providing mechanical or technical services or advice concerning a component part does not, by itself, subject a component seller to liability.  Id.  
The record shows that Honeywells engineers met with Rheems engineers to discuss a problem that developed in pairing Honeywells motor to Rheems damper assembly.  Additionally, Rheem requested and received approval from Honeywell to use a counterweight and to change the warning label to acknowledge Rheems application.  At most, this establishes that Honeywell knew of the intended use for the M892 and that Honeywell provided mechanical or technical services or advice.  Without more, Honeywell is not subject to liability for defects in Rheems final damper assembly design, because Appellants have failed to provide any evidence that Honeywell had control over Rheems choice of design. 
B. Inadequate Warning
Appellants next argue that Honeywell failed to provide an adequate warning.  South Carolina recognizes the principle that a seller of a dangerous product must provide an adequate warning to the user to prevent liability.  Allen at 427, 505 S.E.2d at 357.  However, we note that there is no evidence that the M892 was dangerous.  Additionally, it is undisputed that Rheem received notice of the warning requiring a spring because Rheem requested the change in the language on the warning label.
Even if this were not true, however, Honeywell would still not be liable.  Component parts manufacturers generally have no duty to warn end users of the potentially dangerous uses to which their products may be put.  Jacobs, 67 F.3d at 1236.  This would require speculation as to subsequent applications.  Id.  Moreover, any such duty is fulfilled by the sophisticated intermediary rule.  Under this rule, a component supplier is not required to provide a warning to end users if it is reasonable for the supplier to rely on the buyer to take precautions to protect end users.  Id. at 1240-41.  The same rule applies when the buyer is a large employer that knows or should know of the dangers to its employees inherent in the supplies it purchases.  Bragg v. Hi-Ranger, Inc., 319 S.C. 531, 550, 462 S.E.2d 321, 332 (Ct. App. 1995).  Rheem was a manufacturer of water heaters that was familiar with the need for a failsafe mechanism for its damper, and Honeywell reasonably relied on Rheem to provide an adequate warning to end users.  Accordingly, we hold that Appellants failure to warn claim fails as a matter of law.
C. Express or Implied Warranty
Our finding that the M892 was not defective disposes of Appellants warranty claims also.  Appellants assert that certification of the D892 with the AGA created an express warranty covering the M892 without providing any legal support for their theory whatsoever.[5]  The express warranty provided with the M892 was factually inapposite.  We note that the express warranty specifically and conspicuously disclaimed all other express or implied warranties as required by South Carolina Code section 36-2-316.  Appellants argument that section 36-2-318 prevents disclaimer of warranties is also without merit.  The reporters comments to section 36-2-318 make clear that this section does not prevent disclaimers but is instead intended to abolish the privity defense.  S.C. Code Ann. § 36-2-318, official cmt. 1 (2003).  Therefore, summary judgment for Honeywell on this issue was proper.
D. Negligence
Liability for negligence requires Appellants to show that Honeywell breached its duty to use due care in adopting a safe design.  Allen at 426, 505 S.E.2d at 356.  The trial court correctly found that Appellants failed to demonstrate that Honeywell had any knowledge of a problem with its M892 motor.  Honeywells statement that it had no prior claims filed against it involving the M892 went unchallenged.  See Oglesby v. General Motors Corp., 190 F.3d 244, 252 (4th Cir. 1999) (finding summary judgment on the issue of negligence appropriate under South Carolina law when defendants statement that it had no prior claims involving the part at issue went unchallenged).  In addition, Appellants expert admitted that the M892 by itself was safe, and there is no evidence that the unit in question failed.
Appellants further argue that subsequent modification does not preclude liability for the manufacturer.  However, the cases Appellants cite all involve situations in which the product was defective prior to the alteration.  See Small v. Pioneer Mach., Inc., 329 S.C. 448, 466, 494 S.E.2d 835, 844 (Ct. App. 1997) (finding that subsequent modifications did not causally contribute to the injury); Fleming v. Borden, Inc., 316 S.C. 452, 457, 450 S.E.2d 589, 592 (1994) (finding modification foreseeable because of defective design).  Subsequent modification cannot be used to impose liability on the manufacturer of a non-defective product. 
E. Proximate Cause
Appellants product liability claims also fail because they cannot prove proximate cause.  Proximate cause is an essential element in products liability claims, whether brought under strict liability, negligence, or warranty theories.  Small at 463, 494 S.E.2d at 842.  Proximate cause requires proof of both causation in fact and legal causation.  Causation in fact is proven by establishing the injury would not have occurred but for the defendants negligence.  Legal cause is proven by establishing foreseeability.  Id. 
In this case, Appellants cannot show that Honeywells actions were a but for cause of their injuries.  The trial court found that Honeywells motor was disconnected from the damper assembly at the time the incident occurred.  Although on a summary judgment motion we must take all evidence in the light most favorable to the non-moving party, we find no evidence contradicting the trial judges finding.  
The only evidence Appellants offer in opposition is the ambiguous testimony of one of their experts, who testified that the damper had been disconnected [w]ithin a couple hours of the incident.  Appellants contend that their expert intended to say that the damper was disconnected from the motor after the accident.  However, the testimony of their expert that the half-open position of the damper caused the incident indicates that he meant the damper was disconnected before the incident occurred.  Another of Appellants experts testified that the disconnected damper would have eventually created a problem, but did not on this occasion because other factors caused the carbon monoxide buildup on the date in question.  
Intentionally disconnecting a safety feature breaks any causal link.  See Young v. Tide Craft, Inc., 270 S.C. 453, 242 S.E.2d 671 (1978) (holding that the boat manufacturer was not liable because a mechanics action in splicing a steering cable broke the causal link); see also 63 Am. Jur. 2d Products Liability § 39 (2004) (stating that a manufacturer is not liable when a third partys alteration of the product amounts to a superceding cause of the injury).  No evidence suggests the damper was disconnected due to any problem with the motor.  Therefore, summary judgment was proper because Appellants cannot show proximate cause.[6]
II. Unfair Trade Practices Claim
Appellants next assert that the trial court erred in granting Honeywells motion for summary judgment on their Unfair Trade Practices claim.  We disagree.  
Under the South Carolina Unfair Trade Practices Act (UTPA), any person suffering an ascertainable loss of money or real or personal property as a result of a defendants unfair or deceptive practices may bring an action for damages.  S.C. Code Ann. § 39-5-140 (1985).  In order to recover under UTPA, a plaintiff must demonstrate that (1) the defendant engaged in an unlawful trade practice; (2) the plaintiff suffered actual, ascertainable damages as a result of the defendants use of the unlawful trade practice; and (3) the unlawful trade practice had an adverse impact on the public interest.  Id.; see also section 39-5-20.  An act is unfair under the UTPA when it is offensive to public policy or when it is immoral, unethical, or oppressive, and a deceptive practice is one that has a tendency to deceive.  Johnson v. Collins Enter. Co., Inc., 349 S.C. 613, 636, 564 S.E.2d 653, 665 (2002).  
The trial court properly granted summary judgment on Appellants UTPA claim.  There is no evidence of any immoral, unethical or oppressive conduct by Honeywell, or of any act tending to deceive.  The M892 was not defective and there is no evidence of any attempt to misrepresent its compliance with safety standards.  The fact that the AGA agreed to certify Rheems damper using test data from Honeywells certification of the D892 does not equate to a deceptive or unfair practice by Honeywell.  Moreover, since the Appellants cannot show evidence of repetition, there can be no adverse public impact.  No claims regarding the M892 have been filed prior to this case and Honeywell no longer manufactures this part.  
III. Intentional Infliction of Emotional Distress Claim
The trial court also properly granted summary judgment for Honeywell on Appellants intentional infliction of emotional distress claim.  The requirements for establishment of the tort are: 

 (1) the defendant intentionally or recklessly inflicted severe emotional distress, or knew that distress would probably result from his conduct; (2) the defendants conduct was so extreme and outrageous that it exceeded all possible bounds of decency and was furthermore atrocious, and utterly intolerable in a civilized community; (3) the actions of the defendant caused the plaintiffs emotional distress; and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it. 

Gattison v. S.C. State College, 318 S.C. 148, 151-52, 456 S.E.2d 414, 416 (Ct. App. 1995).   A judge should not submit a claim of intentional infliction of emotional distress to the jury unless reasonable persons might differ on the issue.  Id.  Even unprofessional, inappropriate behavior by a defendant is insufficient.  Id. at 157, 456 S.E.2d at 419.
There is no evidence of any unprofessional or inappropriate behavior by Honeywell, much less conduct so extreme and outrageous as to exceed all possible bounds of decency.  Accordingly, we affirm on this issue as well. 
IV. Recusal of the Trial Judge
Finally, Appellants argue that the trial judge should have recused himself.  A trial judges refusal to disqualify himself will not be reversed on appeal absent evidence of judicial prejudice.  State v. Cheatham, 349 S.C. 101, 111, 561 S.E.2d 618, 624 (Ct. App. 2002).  It is not enough for a party seeking disqualification to simply allege bias.  The party must show some evidence of bias.  Furthermore, the alleged bias must be personal, as distinguished from judicial, in nature.  Id. (citations omitted). 
Counsel for Appellants assert that the trial judge showed a lack of judicial decorum and open hostility toward her during the motions hearing held on September 24, 2002.  At that hearing, which was held the day before the deadline for the fourth scheduling order, counsel for Appellants had moved to compel certain discovery.  Appellants counsel believed that Honeywell and Rheem were in bed together and demanded repeatedly that Honeywell produce documents to substantiate this theory.  The trial judge found that all of the records that existed had already been produced.  Appellants counsel had requested information about component parts of the M892, apparently confounding the M892 with the D892, which was not used in Rheems damper assembly.  The trial judge explained this to Appellants counsel and denied the motion.  Nonetheless, Honeywell was ordered to produce any relevant records that had not yet been produced.  
 We find no evidence of personal or prejudicial bias in the record.  The trial judge simply sought to prevent waste of judicial resources by cutting short Appellants counsels continued efforts to make arguments that were clearly based on a misapprehension of the facts.  The trial judge informed Appellants counsel that he had carefully reviewed the documents before making the ruling.  We note that the trial judge even attempted to reconcile any hard feelings produced as a result of this exchange.  
We hold that the trial judge did not abuse his discretion in denying Appellants motion to recuse.  We have reviewed Appellants remaining grounds for appeal and find them to be without merit. 
CONCLUSION

          We hold that Appellants have failed to establish a products liability claim.  The M892 was not defective, and we decline to impose liability on a component manufacturer for design defects in the products into which component parts are incorporated.  Additionally, Honeywells warning was adequate and, in any case, any duty to warn was fulfilled when Rheem, a sophisticated purchaser, received notice of the need for a return mechanism.  Moreover, Appellants cannot show proximate cause on any of their products liability claims.  Appellants warranty and negligence claims are without merit.  Likewise, the UTPA and intentional infliction of emotional distress claims lack any support from the record.  Summary judgment for Honeywell was therefore proper.  
AFFIRMED. 
ANDERSON, BEATTY, and SHORT, JJ., concur.

[1] We decide this case without oral argument pursuant to Rule 215, SCACR.
[2] Appellants erroneously assert that the M892 required a return spring as a failsafe mechanism.  The D892 damper assembly utilized a return spring.  The M892 was simply a motor (the actuator motor from the D892 damper assembly, sold separately) which Rheem bought and incorporated into its damper design.   
[3] The test results demonstrated the presence of carbon monoxide in rooms 228-233 and 128-137.  Of the Appellants, only two were in rooms testing positive for carbon monoxide at the time of the incident. 
[4] This expert attempted to disclaim this admission in a later deposition.  However, the disclaimer is ineffective because it essentially offers a legal opinion that Honeywells participation in Rheems final damper renders Honeywell liable.  See Kirkland v. Peoples Gas Co., 269 S.C. 431, 434, 237 S.E.2d 772, 773 (1977) (excluding expert testimony as to issues of law). 
[5] Appellants also assert that Rheems certification of compliance sticker on the water heater created an express warranty by Honeywell.  Appellants offer no legal basis for this theory. 
[6] We also note that Appellants expert testimony offered to show exposure to carbon monoxide was based on speculation rather than hard test data.  None of the experts had actually visited the site of the incident.  Thus, Appellants have failed to demonstrate proximate cause for this reason also.  See Oglesby at 249 ([A] plaintiff may not prevail in a products liability case by relying on the opinion of an expert unsupported by any evidence such as test data or relevant literature in the field.).