[No. D041142. Fourth Dist., Div. One. Mar. 8, 2004.]

SCOTT BOWEN et al., Plaintiffs and Appellants, v.
ZIASUN TECHNOLOGIES, INC., Defendant and Respondent.

[CERTIFIED FOR PARTIAL PUBLICATION*]

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II.B. through II.F. of the Discussion.

**COUNSEL**

James A. Shalvoy for Plaintiffs and Appellants.

Smith, Chapman & Campbell, John S. Clifford and Stephanie P. Alexander for Defendant and Respondent.

**OPINION**

**NARES, Acting P. J.**—This is an appeal from a grant of summary judgment in favor of defendant Ziasun Technologies, Inc. (Ziasun), on two consolidated actions filed by plaintiffs Scott Bowen and Leif Aa. Fredsted (together sometimes, plaintiffs), which alleged that they were defrauded by a "pyramid" or "Ponzi" scheme orchestrated by foreign brokerage houses from which they purchased shares of stock. The court granted summary judgment in favor of Ziasun, finding that there was no legal basis for or evidence to support plaintiffs' claims against Ziasun.

On appeal Bowen and Fredsted assert that the court erred in granting summary judgment when it found that (1) plaintiffs' claims brought under

Business & Professions Code section 17200[1] had no application to the securities transactions at issue; (2) plaintiffs failed to provide any admissible evidence that Ziasun made any misrepresentations to plaintiffs and that Ziasun was not an offeror of securities; (3) no evidence supported plaintiffs' conversion and conspiracy claims; and (4) plaintiffs were not entitled to a continuance of the hearing on the summary judgment motion to conduct further discovery. We conclude that the court did not err in granting summary judgment or in denying leave to conduct additional discovery and therefore affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Plaintiffs' Allegations*

Bowen is a resident of Australia. Fredsted is a resident of Norway. Ziasun is a publicly traded Nevada corporation that formerly had its headquarters in San Diego County.

In February 2001 Bowen filed a complaint in the San Diego Superior Court against Ziasun and others.[2] Bowen's complaint alleged that Ziasun, acting in concert with others, sold approximately $365,625.50 of its stock and the stock of other publicly traded companies to Bowen by making misstatements and omissions of material fact. Bowen alleged that Ziasun failed to disclose that it was using investors' funds to perpetrate a pyramid or Ponzi scheme and that Ziasun's stock had little or no market value.

Specifically, Bowen alleged that in 1998, he was contacted by defendant Frank Robinson, who held himself out to be a senior consultant at Amber Securities Corporation (Amber), now allegedly known as defendant World Trade Financial Corporation (World Trade), who solicited him to invest in a company called Titan Motorcycles of America, Inc. (Titan). At that time Bowen did not invest.

In June 1999, Robinson contacted him again, soliciting an investment in Ziasun. Robinson stated that Amber had changed its name to Capital Assets, Ltd. (Capital). Based upon Robinson's solicitation, Bowen purchased 1,000 shares of Ziasun stock. However, he was not told that (1) the stock was restricted; (2) the funds he was investing would be used to finance criminal behavior, securities fraud, pornography, false corporate disclosures, and illegal business practices; (3) returns would be paid from new investors' funds; and (4) there was little or no market for the stock.

Thereafter, defendant Robert Mason contacted him and stated that he would now be handling his account on behalf of Capitol, and solicited him to

---

[1] All further statutory references are to the Business and Professions Code unless otherwise specified.

[2] The other defendants, several individuals and one corporation, are not parties to this appeal.

invest in several other companies. Mason introduced him to a Lynn Briggs, who Mason described as being a financial and investment consultant for Capital. Mason told Bowen that Briggs and Capital had a "close association with Ziasun" and other companies, including Chequemate International, Inc. (Chequemate), Loraca International, Inc. (Loraca), Asia4Sale, Inc. (Asia4Sale), and Castpro.com, Inc. (Castpro). Briggs touted Ziasun and the other companies for investment. Briggs told Bowen that no investor had ever lost money with these companies because of Capital's "close association and intimate knowledge" of the companies being recommended. Based upon the misrepresentations made by Robinson, Mason and Briggs, Bowen bought stock in Ziasun, Chequemate, Loraca, Asia4Sale, Castpro and Novamed, Inc. (Novamed), at a total cost of $365,625.50. Bowen alleged Robinson, Mason and Briggs were acting as agents for the companies in which he invested, including Ziasun. Further, Bowen alleged that their actions were taken at the direction of defendant Bryant Cragun, an alleged investment advisor and fundraiser for the companies Bowen invested in, including Ziasun.

The complaint stated causes of action for unfair, unlawful and deceptive business practices under section 17200, common law fraud, securities fraud, injunctive relief, conversion and conspiracy.

In August 2001 Fredsted filed an action in the San Diego County Superior Court against Ziasun, as well as other individuals and one corporation (see fn. 2, *ante*). Similar to Bowen's complaint, Fredsted alleged that Ziasun, acting in concert with other individuals and entities, induced him to buy $108,840.10 worth of stock by making misstatements and omissions of fact. However, Fredsted did not allege that he ever purchased any Ziasun stock. Fredsted's complaint mirrored Bowen's in its allegations of a pyramid or Ponzi scheme and stated the same causes of action, with the exception of alleging contact with different individual agents who solicited his investment, and some different companies in which he invested.

Fredsted's complaint alleged that in January 2000 he was contacted by defendant Richard Swatman. Swatman told him that he was a broker and portfolio advisor with Capital and solicited his investment in Chequemate. He purchased 250 shares based upon the representations of Swatman.

Shortly after the initial purchase, he was advised of an increase in the price of Chequemate and was solicited by Swatman to purchase additional shares. After he agreed to buy the additional shares, Swatman told him that the stock was restricted and could not be sold for one year. Fredsted also alleged that he was not advised that (1) funds invested by him would be used by the defendants to finance activities involving criminal behavior, securities fraud, pornography, false corporate disclosures, and illegal business practices; (2)

returns on his investment would be made from new investors' funds, i.e., a pyramid or Ponzi scheme; and (3) that little or no market existed for the Chequemate stock.

According to Fredsted, shortly after he opened his account with Capital defendant James Howard contacted him and advised him that he would now be his account manger, and solicited him to invest in Asia4Sale, Castpro, RealestateFederation.com (REF) and Broadcast International (Broadcast). Howard arranged a meeting between himself and Briggs, who Howard represented to be a consultant for Capital and as having a "close association" with the companies being touted. At the meeting, Briggs touted the stock of several companies and represented that he was closely affiliated with Broadcast. Between January and December 2000, based upon the misrepresentations of Swatman, Howard and Briggs, Fredsted invested $108,840.10 in the stock of Broadcast, Chequemate, REF, Asia4Sale, and Castpro. Fredsted further alleged that their actions were taken at the direction of defendant Cragun, who allegedly was an investment advisor and fundraiser for the companies in which he invested, and Ziasun as well.

The court thereafter consolidated Bowen's and Fredsted's actions.

### B. *Summary Judgment Motion*

#### 1. *Ziasun's moving papers*

In July 2002, Ziasun brought a motion for summary judgment or, alternatively, for summary adjudication of issues. Ziasun argued that the first through third causes of action brought under section 17200 were without merit because that statute did not apply to securities transactions. Ziasun argued that the fourth cause of action for fraud failed as Bowen and Fredsted could not show any facts demonstrating that plaintiffs had purchased Ziasun stock or that Ziasun defrauded them. Ziasun argued that the fifth cause of action for securities fraud was without merit because (1) there were no facts showing that it violated the law on securities fraud; and (2) Ziasun was not a seller or offeror of securities. Ziasun asserted that the sixth cause of action for injunctive relief failed as there was no viable cause of action to support this remedy. Ziasun asserted that the seventh cause of action for conversion was without merit as there was no identifiable sum of money that it was unlawfully interfering with. Finally, Ziasun argued that the eighth cause of action for conspiracy was without merit as there was no evidence that Ziasun conspired with anyone else to commit any wrongdoing.

In support of the motions, Ziasun submitted the declaration of D. Scott Elder, the vice-president of INVESTools, Inc., the successor merger company of Ziasun. According to Elder, Fredsted was never a shareholder of Ziasun, and Ziasun never had any direct dealings with either plaintiff. Elder also stated that Ziasun was never the parent company of Asia4Sale and never

exercised any control over that company. Ziasun had no part in any alleged scheme against plaintiffs and, to Elder's knowledge, no Ziasun employees ever engaged in any insider trading. According to Elder, Ziasun never converted anything belonging to plaintiffs and never directed any communication to plaintiffs. Elder also denied that Ziasun was engaged in any conspiracy with any other defendants to deprive plaintiffs of money or property.

According to Elder, defendant Cragun resigned from Ziasun as a consultant in 1998 and never held a position with Ziasun as an officer, director, agent or employee at the times relevant to the plaintiffs' complaint. Similarly, Elder stated that Briggs ceased his affiliation with and resigned from Ziasun in 1998, before the events alleged in plaintiffs' complaint. Elder also stated that none of the other defendants was ever an agent or employee of Ziasun.

Ziasun attached to its motion Fredsted's responses to Ziasun's requests for admissions, wherein Fredsted stated that he lacked sufficient information or belief to admit or deny whether he had any facts supporting his allegations. Ziasun also submitted both plaintiffs' responses to interrogatories, wherein plaintiffs did not identify any facts supporting their allegations.

### 2. Discovery dispute

Following the filing of plaintiffs' complaint, Ziasun obtained an order under Code of Civil Procedure section 1030 requiring plaintiffs to each post a bond of $25,000 within 10 days to secure payment of costs to Ziasun should it prevail, as a condition of allowing plaintiffs' action to proceed.[3] Plaintiffs were unable to post the bond within the 10 days ordered by the court and Ziasun brought a motion to dismiss the complaint.

In June 2002, plaintiffs noticed a deposition for Ziasun's person most knowledgeable (PMK). Ziasun objected to the deposition notice on the basis that (1) plaintiffs had not timely posted the bond ordered by the court and the action was therefore subject to dismissal; and (2) the deposition was overbroad, burdensome and harassing, seeking 78 categories of issues for the PMK to testify about and 212 categories of documents. Ziasun did not appear at the deposition.

In July 2002, plaintiffs brought an ex parte application to shorten time for an order compelling the deposition of Ziasun's PMK. The court denied

---

[3] Code of Civil Procedure section 1030 provides in part: "(a) When the plaintiff in an action or special proceeding resides out of the state, or is a foreign corporation, the defendant may at any time apply to the court by noticed motion for an order requiring the plaintiff to file an undertaking to secure an award of costs and attorney's fees which may be awarded in the action or special proceeding. . . . [¶] (b) The motion shall be made on the grounds that the plaintiff resides out of the state or is a foreign corporation and that there is a reasonable possibility that the moving defendant will obtain judgment in the action or special proceeding."

plaintiffs' motion without prejudice on the basis that Ziasun's motion to dismiss was pending. In July 2002, the court denied Ziasun's motion to dismiss as the bonds had been posted, albeit in an untimely fashion. The court also thereafter granted Ziasun's ex parte application to continue the trial date to October 2002.

In August 2002, plaintiffs brought a second ex parte application for an order shortening time to bring a motion to compel the deposition of Ziasun's PMK. Plaintiffs argued that they had noticed the deposition of Ziasun's PMK, but Ziasun did not appear for the deposition and the deposition was necessary to oppose Ziasun's pending motion for summary judgment. The court took Ziasun's motion for summary judgment off calendar and ordered that each side was "entitled to depose the parties and persons most knowledgeable."

On September 3, 2002, plaintiffs renoticed the deposition of Ziasun's PMK for September 18, 2002. However, on September 6, 2002, the court reset Ziasun's summary judgment motion for September 13, 2002, to be heard at the same time as the parties' discovery disputes.

### 3. *Plaintiffs' opposition*

In opposing Ziasun's motion, plaintiffs (1) objected to the evidence submitted by Ziasun; (2) argued that triable issues of fact existed precluding summary judgment; and (3) argued that the motion should be denied or continued to allow them to conduct further discovery. However, plaintiffs did not submit any legal authority disputing the legal basis for Ziasun's summary judgment motion.

In opposition to Ziasun's motion for summary judgment, plaintiffs submitted the declaration of their counsel, James Shalvoy, their own declarations, and documentary evidence. Shalvoy's declaration referenced several items of documentary evidence submitted with plaintiffs' opposition. First he identified excerpts from a deposition transcript in another case wherein a witness by the name of Allen Hardman, president of Ziasun, testified that Briggs worked for Cragun in some unknown fashion. He also attached a copy of a lawsuit filed by Cragun in which Cragun stated that he had served as an investment adviser and fundraiser for Ziasun, Titan, Chequemate, Dynatec, Loraca and Bevex. Shalvoy also attached a copy of a Nevada certificate of corporate information showing that as of April 2000 Cragun was president and Briggs was secretary and treasurer of a company named Applied Technology Consultants, Inc. Shalvoy attached a Nevada annual list of officers, directors and agents for Ziasun, filed in April 1999, wherein Briggs's name was crossed out as president of Ziasun and the name Tony Tobin is handwritten in. Hardman was listed as a director of Ziasun. Shalvoy attached a copy of a 1998 Nevada annual list of officers, directors and agents for a company called Best Way, USA, showing Briggs as president.

Shalvoy also attached a copy of an article from the South China Morning Post, which alleged that Ziasun, when it was known as Momentum Internet, "ran sex-related businesses" and "was behind a stable of porn Web sites and phone chat lines that promised Bangkok Babes and China Dolls." Shalvoy also attached a copy of a 1999 press release that stated that Amber Global Limited, acting as agent for Amber, was successfully prosecuted for dealing in securities while unregistered. Shalvoy also detailed his attempts to take the deposition of the PMK for Ziasun and requested that Ziasun's motion be denied because plaintiffs had been unable to conduct discovery necessary to oppose the motion.

Fredsted's declaration essentially mirrored his complaint, with a few items of documentary evidence attached. It detailed his interactions with Swatman, Howard and Briggs, their representations to him, and their alleged improper activities concerning the stock in which he invested, and his purchase of stock in Broadcast, Chequemate, REF, Asia4Sale, and Castpro, all as detailed above. Fredsted also attached to his declaration business cards for Briggs, showing him to be a managing director of The Amber Group and an "investment relations officer" for Broadcast. He also attached a copy of an article from the Wall Street Journal concerning, among other things, Ziasun's alleged activities. He attached a brochure he received from Howard that stated that Ziasun was the "parent company" of Asia4Sale. He stated that his investments were now worthless.

Bowen's declaration also essentially mirrored his complaint, again, with a few additions. He related his contacts with Robinson, Mason and Briggs, their solicitation of his investment in Ziasun, Chequemate, Loraca, Asia4Sale and Castpro, and the alleged illegal and improper activities surrounding his stock that he purchased. He also detailed the purchase dates of his stock in Ziasun and attached invoices for those stock purchases. He attached an e-mail correspondence he received describing the relationship between Ziasun and Asia4Sale. He stated that the investments he made were now worthless.

Ziasun filed a reply to plaintiffs' opposition, not only addressing plaintiffs' opposition on the merits, but also filing written objections to much of plaintiffs' evidence.

### C. *Court's Ruling*

In September 2002, the court granted Ziasun's motion for summary judgment by telephonic ruling. The court found that the first through third causes of action brought under section 17200 failed as a matter of law because section 17200 "does not apply to securities transactions." The court found that the fourth cause of action for fraud did not have merit because plaintiffs had not produced evidence that they ever purchased shares of Ziasun. The fifth cause of action for corporate securities fraud failed because

plaintiffs could not show that Ziasun violated the statute, was a seller or offeror of securities or made any misrepresentation to plaintiffs. The sixth cause of action for injunctive relief was found to have no merit because no specific identifiable sum of money was involved.[4] The eighth cause of action for conspiracy failed because plaintiffs could not show that Ziasun participated in any concerted action, or that a common plan to commit tortious acts existed. The court also found that the plaintiffs could not demonstrate good cause for a continuance of the motion for summary judgment to conduct further discovery.

Plaintiffs requested oral argument. At that hearing, the court addressed plaintiffs' request for further discovery based upon their inability to proceed with the deposition of Ziasun's PMK. The court stated that its notes showed that as of the ex parte hearing on August 15 it had given them the permission to go forward with the deposition of the person most knowledgeable for Ziasun. Counsel for Ziasun argued that plaintiffs did not move forward with discovery on a timely basis, never made efforts to resolve the discovery dispute and did not try to set the deposition of Ziasun's PMK in a timely manner after the court gave it permission to take that deposition. The court took the matter under submission and thereafter confirmed its telephonic ruling. In doing so, the court specifically addressed plaintiffs' request for further time to conduct discovery: "The Court notes that at an ex parte on 7/17/02 the court continued the [trial] date to October 18, 2002. At ex parte on 8/15/02 each side sought a motion to compel discovery. The Court set a global motion for September 13, 2002. The Court stated each side was entitled to reasonably depose the parties and the Persons Most Knowledgeable (PMK). However, Plaintiff[s] failed to ever accomplish this."

This appeal follows.

## DISCUSSION

### I.  *Standard of Review*

On an appeal from an order granting summary judgment, we independently examine the record to determine whether a triable issue of material fact exists. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767 [107 Cal.Rptr.2d 617, 23 P.3d 1143].) In performing our review, we view the evidence in the light most favorable to the losing parties (here Bowen and Fredsted), resolving any evidentiary doubts or ambiguities in their favor. (*Id.* at p. 768.)

---

[4] Apparently, this finding mistakenly refers to the claim for injunctive relief, instead of the claim for conversion. That mistake was cured by the final order granting summary judgment, in which the court states that it was granting the motion as to the claim for conversion on the basis that there was not a "specific identifiable sum involved."

"[T]he party moving for summary judgment [(here Seacoast)] bears the burden of persuasion that there is no triable issue of material fact and that [it] is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493], fn. omitted (*Aguilar*).) "A defendant [moving for summary judgment] bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto. [Citation.]" (*Ibid.*; Code Civ. Proc., § 437c, subd. (o).[5]) In such a case, the defendant bears the "initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar, supra,* 25 Cal.4th at p. 850.)

■ If the defendant meets its burden of production, the burden shifts to the plaintiff to make its own prima facie showing of the existence of a triable issue of material fact. (*Aguilar, supra,* 25 Cal.4th at p. 850.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Ibid.*)

## II. *Analysis*

### A. *Section 17200 Claims*

Bowen and Fredsted assert that the court erred in finding that section 17200 does not apply to securities transactions. Although this is a question of first impression in California, we find federal and out-of-state authority persuasive on this issue and conclude that the court did not err in granting Ziasun's motion on this basis.

Section 17200 provides in part: "[U]nfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Section 17200 is known as California's "little FTC Act," which mirrors its federal counterpart, the Federal Trade Commission (FTC) Act, 15 United States Code section 45 et seq. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1263–1264 [10 Cal.Rptr.2d 538, 833 P.2d 545].) Historically, the FTC has not viewed the FTC Act as reaching securities transactions. (*Russell v. Dean Witter Reynolds, Inc.* (1986) 200 Conn. 172 [510 A.2d 972, 977] (*Russell*) ["The FTC has never undertaken to adjudicate deceptive conduct in the sale and purchase of securities"].)

---

[5] Code of Civil Procedure section 437c, subdivision (o) provides: "A cause of action has no merit if either of the following exists: [¶] (1) One or more of the elements of the cause of action cannot be separately established, even if that element is separately pleaded. [¶] (2) A defendant establishes an affirmative defense to that cause of action."

Further, federal cases (some, admittedly unpublished) have held that California's section 17200 also does not apply to securities transactions. (See *Dietrich v. Bauer* (S.D.N.Y. 1999) 76 F.Supp.2d 312, 351; *Perera v. Chiron Corp.* (N.D.Cal. 1996) 1996 U.S. Dist. Lexis 22503, 1996 WL 251936; *Shearson Lehman Brothers, Inc. v. Greenberg* (C.D.Cal. 1993) [1992–93 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 97,409, affd. *Shearson Lehman Brothers Inc. v. Greenberg* (9th Cir. 1995) 60 F.3d 834 ["Cal. Bus. & Prof. Code § 17200 is inapplicable to securities transactions"].)[6]

Additionally, at least 15 other jurisdictions that have considered whether investment securities are within the scope of their consumer protection statutes have reached the same conclusion, holding that claims based upon securities violations are not actionable under those statutes. (See *Spinner Corp. v. Princeville Dev. Corp.* (9th Cir. 1988) 849 F.2d 388 [Hawaii law] (*Spinner*); *Russell, supra,* 510 A.2d 972 [Conn. law].)[7] Only three states have ruled that their little FTC Acts apply to securities transactions. (See *Denison v.*

---

[6] California Rules of Court, rule 977 (a) prohibits the citation of opinions from this state that are not "certified for publication or ordered published." However, rule 977 does not address whether it is appropriate for California appellate courts to cite unpublished federal opinions. One treatise indicates that it is appropriate to cite such opinions, as long as they are available online. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2003) ¶ 11:189, p. 11-73 (rev. # 1, 2002).) One case (discussed, *post*) has noted that the Ninth Circuit's rule 36-3 prohibits the citation of unpublished Ninth Circuit opinions and suggests that the California Supreme Court "may wish to address this apparent oversight in [California Rules of Court,] rule 977, by considering the adoption of an amendment that is consistent with the Ninth Circuit rule [(U.S. Cir. Ct. Rules (9th Cir.), rule 36-3)] as to such unpublished cases." (*Roskind v. Morgan Stanley Dean Witter & Co.* (2000) 80 Cal.App.4th 345, 355 [95 Cal.Rptr.2d 258] (*Roskind*).) To date, rule 977 has not been amended to state that nonpublished federal cases may not be cited in California, indicating that it is appropriate to do so. At any rate, we do not rely upon any unpublished federal opinions in reaching our conclusion in this case, but merely to recognize that federal courts have addressed section 17200's application to securities transactions. (*Mangini v. J.G. Durand International* (1994) 31 Cal.App.4th 214, 219 [37 Cal.Rptr.2d 153] [proper to cite to depublished opinions to illustrate the same issue was presented in those cases and that it remained unresolved].)

[7] (See also *Smith v. Cooper* (5th Cir. 1988) 846 F.2d 325 [La. law]; *Swenson v. Engelstad* (5th Cir. 1980) 626 F.2d 421 [Tex. law]; *Nichols v. Merrill Lynch, Pierce, Fenner & Smith* (M.D.Tenn. 1989) 706 F.Supp. 1309 [Tenn. law]; *Morris v. Gilbert* (E.D.N.Y. 1986) 649 F.Supp. 1491 [N.Y. law]; *Robertson v. White* (W.D.Ark. 1986) 633 F.Supp. 954 [Ark. & Okla. law]; *In re Catanella* (E.D.Pa. 1984) 583 F.Supp. 1388 [N.J. law]; *Taylor v. Bear Stearns & Co.* (N.D.Ga. 1983) 572 F.Supp. 667 [Ga. law]; *Cabot Corp. v. Baddour* (1985) 394 Mass. 720 [477 N.E.2d 399], superseded by statute as stated in *Ansin v. River Oaks Furniture, Inc.* (1st Cir. 1997) 105 F.3d 745 [Mass. law]; *State v. Piedmont Funding Corp.* (1978) 119 R.I. 695 [382 A.2d 819] [R.I. law]; *Skinner v. E.F. Hutton & Company, Inc.* (1985) 314 N.C. 267 [333 S.E.2d 236] [N.C. law]; *State ex rel. McLeod v. Rhoades* (1980) 275 S.C. 104 [267 S.E.2d 539], overruled on other grounds as stated in *Johnson v. Collins Entertainment Co., Inc.* (2002) 349 S.C. 613 [564 S.E.2d 653] [S.C. law]; *Kittilson v. Ford* (1979) 23 Wn.App. 402 [595 P.2d 944], affd. *Kittilson v. Ford* (1980) 93 Wn.2d 223 [608 P.2d 264] [Wash. law]; Smolin, *Investment Securities: Beyond the Scope of California's Consumers Legal Remedies Act?* (1991) 25 Loyola L.A. L.Rev. 127, 153.)

*Kelly* (M.D.Pa. 1991) 759 F.Supp. 199 [Pa. law]; *Onesti v. Thomson & McKinnon Securities, Inc.* (N.D.Ill. 1985) 619 F.Supp. 1262 [Ill. law]; *State ex rel. Corbin v. Pickrell* (1983) 136 Ariz. 589 [667 P.2d 1304] [Ariz. law].)

■ No published decision in California has yet reached the issue. However, based upon persuasive federal and out-of-state authority,[8] we conclude that section 17200 does not apply to securities transactions. *Spinner, supra,* 849 F.2d 388, a Ninth Circuit case interpreting Hawaii law, is instructive.

In *Spinner,* the Ninth Circuit was interpreting Hawaii's little FTC Act, which is almost identical to California's. (*Spinner, supra,* 849 F.2d at p. 389.) The court there concluded that in enacting Hawaii's little FTC Act, the "primary intent of the legislature was to protect consumers from unethical business practices resulting in relatively small commercial injuries. . . . Actions involving securities, such as the ones alleged in this case, are not typically on the agenda of consumer advocates." (*Spinner,* at p. 391.) The court there also relied upon the fact that its federal counterpart, the FTC Act, "has not been applied in a securities context since 1923. [Citation.]" (*Spinner, supra,* 849 F.2d at p. 391.)

The *Spinner* court also relied on decisions interpreting other states' little FTC Acts, including *Russell, supra,* 510 A.2d 972, 977, wherein that court stated: "The FTC has never undertaken to adjudicate deceptive conduct in the sale and purchase of securities, presumably because such transactions fall under the comprehensive regulatory umbrella of the Securities and Exchange Commission. . . . [T]he plaintiff has cited no case in which the FTC or a federal court has applied the FTC Act to a securities transaction and we have found none. . . . Consequently, in this case, taking our guidance from the FTC, we must construe [the little FTC Act] as not purporting to cover transactions for the purchase and sale of securities." (Citations omitted, fn. omitted.) The Connecticut statute interpreted in that case is also similar to Hawaii's and our own. (*Spinner, supra,* 849 F.2d at pp. 391–392.)

There is nothing to suggest that the intent of the California Legislature in enacting section 17200 was any different from the intent of the Hawaiian Legislature: "to protect consumers from unethical business practices resulting in relatively small commercial injuries." (*Spinner, supra,* 849 F.2d at p. 391.) Further, California cases hold that "we may turn for guidance to the jurisprudence arising under the 'parallel' [citation] section 5 of the [FTC Act]

---

[8] A federal court's application of the law in this area is persuasive in interpreting California's own little FTC Act. (*People ex rel. Mosk v. National Research Co. of Cal.* (1962) 201 Cal.App.2d 765, 772–773 [20 Cal.Rptr. 516]; *People v. Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 530 [206 Cal.Rptr. 164], overruled on other grounds in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163 [83 Cal.Rptr.2d 527].) *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163 [83 Cal.Rptr.2d 548, 973 P.2d 527].)

[citation]. 'In view of the similarity of language and obvious identity of purpose of the two statutes, decisions of the federal court on the subject are more than ordinarily persuasive.' [Citations.]" (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra,* 20 Cal.4th 163, 185.) Because, as discussed, *ante,* the FTC has never applied the FTC Act to securities transactions, and nothing in section 17200 indicates a different intent, we are persuaded that section 17200 should also not reach such transactions.[9]

In support of their assertion that section 17200 does apply to securities transactions, plaintiffs cite *Roskind, supra,* 80 Cal.App.4th 345. However, that case is inapposite.

In *Roskind,* the court only held that federal securities laws do not *preempt* section 17200 claims, concluding: "Application of state laws such as [section 17200] to forbid the practice of trading ahead would not impair or conflict with any provision of federal law, but would be consistent with the purposes and aims of federal law." (*Roskind, supra,* 80 Cal.App.4th at p. 354, fn. omitted.) In doing so, the *Roskind* court relied in part upon the federal securities law, in particular, 15 United States Code section 78bb, which provides that "[t]he rights and remedies provided by this chapter *shall be in addition to* any and all other rights and remedies that may exist in law or in equity." (*Roskind, supra,* 80 Cal.App.4th at p. 355.)

---

[9] It is true that section 17200 addresses not only unfair or deceptive business practices, but "unlawful" ones as well, while section 5 of the FTC Act and other states' similar statutes do not. However, this fact does not change the result. Even after the term "unlawful" was added to former Civil Code section 3369 (the predecessor to § 17200) in 1963, cases interpreting that section and its term "unlawful" continued to rely on the FTC Act for guidance. (*Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 109-110 [101 Cal.Rptr. 745, 496 P.2d 817] [construing term "unlawful" broadly and declaring FTC Act's provisions to be "parallel broad proscription[s]"].) There is nothing to indicate that the Legislature, in adding the term "unlawful" in 1963, sought to take former Civil Code section 3369 outside the parameters of the FTC Act. (See Stern, Bus. & Prof. Code § 17200 Practice (The Rutter Group 2003) 2:26, p. 2-7.) Further, there is no rational reason that the addition of the term "unlawful" should negate federal and out-of-state cases that hold that section 5 of the FTC Act and similar state statutes do not apply to securities transactions. Securities transactions could also be considered "unfair" or "fraudulent" business practices under section 5 of the FTC Act or section 17200. The terms "unfair" or "fraudulent" are actually much broader than the term "unlawful." Thus, unfair or fraudulent practices in securities transactions could meet the statutory definition and be in violation of either section 17200 or the FTC Act without having to be considered "unlawful." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra,* 20 Cal.4th at p. 180.) However, despite the fact that both the FTC Act and state statutes such as section 17200 would on their face appear to reach securities transactions, the FTC, federal courts, and state courts interpreting their own unfair competition statutes have held that securities transaction are exempt. The reasoning is not that they do not meet the definition of "unfair" or "fraudulent," but that section 5 of the FTC Act and similar state statutes were never intended to apply to securities transactions at all because of the comprehensive regulatory umbrella of the Securities and Exchange Commission over such transactions. (*Russell, supra,* 510 A.2d at p. 977; *Spinner, supra,* 849 F.2d at p. 391.)

However, we are not presented here with the question of whether federal securities law preempts section 17200, but rather whether that section and its federal counterpart apply to securities transactions at all. Indeed, *Roskind* rejected as "dictum" the statement in the unpublished federal court decision *Shearson Lehman Brothers, Inc. v. Greenberg, supra,* Fed.Sec.L.Rep. (CCH) ¶ 97,409, that " 'it seems likely that [section] 17200 is preempted entirely by federal securities laws. [Citation.]' " (*Roskind, supra,* 80 Cal.App.4th at p. 355.) The court in *Roskind* characterized that statement as dictum because the court in *Shearson Lehman* was presented not with the issue of preemption that was decided in *Roskind,* but rather decided (as we do here) that section 17200 "did not apply" to securities transactions. (*Roskind, supra,* at p. 355.) The *Roskind* case is inapplicable and does not support a conclusion that section 17200 applies to securities transaction.[10]

In sum, we conclude, based upon the fact that the FTC Act has never been applied to securities transactions, and federal and state authority from 15 other jurisdictions have held that their little FTC Acts do not apply to securities transactions, section 17200 does not apply to securities transactions and the court did not err in dismissing plaintiffs' first three causes of action on that basis.

B.–F.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

McIntyre, J., and O'Rourke, J., concurred.

A petition for a rehearing was denied April 7, 2004, and the opinion was modified to read as printed above.

---

[10] In dicta in a footnote the *Roskind* court also attempted to distinguish the *Spinner* court's decision that Hawaii's little FTC Act did not apply to securities transactions on the basis that section 17200 "[h]as always been given a broad and sweeping" interpretation and because section 17200 "contains no language supporting an exclusion for securities, and under the plain language of [section 17200], we cannot create such an exclusion." (*Roskind, supra,* 80 Cal.App.4th at p. 355, fn. 8.) However, this statement in *Roskind* ignores the fact that courts in this state have consistently treated section 17200 as a "little FTC Act" and have relied upon section 5 of the FTC Act to provide guidance as to its scope. In fact, in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co, supra,* 20 Cal.4th at page 185 (cited by the *Roskind* court in distinguishing *Spinner*), the California Supreme Court expressly relied upon federal precedent in interpreting section 17200, calling section 5 of the FTC Act "parallel" to section 17200. In doing so, the majority also rejected Justice Kennard's dissenting opinion in that case that section 17200 was not a little FTC Act and that federal cases were not persuasive in interpreting section 17200. (*Cel-Tech, supra,* 20 Cal.4th at p. 181, fn. 9; see *id.* at pp. 196–197, fn. 2 (conc. & dis. opn. of Kennard, J.).)

*See footnote, *ante,* page 777.