# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Lauren Proctor and Trans-Union National Title Insurance
Company, f/k/a Atlantic Title Insurance Company,
Respondents,

v.

Whitlark & Whitlark, Inc., d/b/a Rockaways Athletic
Club and Pizza Man, Forrest Whitlark, Paul Whitlark,
Charlie E. Bishop, and Brett Blanks, Defendants,

of whom Whitlark & Whitlark, Inc., d/b/a Rockaways
Athletic Club and Pizza Man, Forrest Whitlark and Paul
Whitlark are Petitioners.

Appellate Case No. 2013-002470

———————

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

———————

Appeal From Richland County
Alison Renee Lee, Circuit Court Judge

———————

Opinion No. 27580
Heard May 19, 2015 – Filed October 7, 2015

———————

## AFFIRMED IN PART AND REVERSED IN PART

———————

Ariail Elizabeth King and James Mixon Griffin, both of
Lewis Babcock & Griffin, L.L.P., of Columbia, for
Petitioners.

Jessica Hanna Lerer and Joseph Preston Strom, Jr., both of Columbia, and Mario Anthony Pacella, of Brunswick GA, all of Strom Law Firm, L.L.C., for Respondent.

---

**JUSTICE BEATTY**:  Lauren Proctor and Trans-Union National Title Insurance Company ("Trans-Union") brought this action against Whitlark & Whitlark, Inc., d/b/a Rockaways Athletic Club ("Rockaways") and Pizza Man, Forrest Whitlark, Paul Whitlark, Charlie E. Bishop, and Brett Blanks (collectively "Defendants") seeking to recover money Proctor lost while gambling on video poker machines located at Rockaways and Pizza Man over the course of several years, including a time period following the South Carolina Legislature's ban of video poker in 2000.  The circuit court granted Proctor's motion for partial summary judgment on her claim under the South Carolina Unfair Trade Practices Act ("UTPA") as to the liability of Defendants.  In so ruling, the court found the Legislature had abrogated the doctrine of *in pari delicto*[1] with regard to losses sustained by illegal gambling for public policy reasons.  The Court of Appeals affirmed.  *Proctor v. Whitlark & Whitlark, Inc.*, 406 S.C. 225, 750 S.E.2d 93 (Ct. App. 2013).  This Court granted Petitioners' request for a writ of certiorari to review the decision of the Court of Appeals.

We find our Legislature has enacted specific gambling loss statutes as the exclusive remedy for a gambler seeking recovery of losses sustained by illegal gambling.  Accordingly, we now overrule our decisions that have implicitly authorized recovery beyond these statutes.  As a result, we hold that one engaged in illegal gambling cannot recover under UTPA.  However, based on the distinct facts of this case, we find that Proctor may pursue the portion of her UTPA claim for the losses she alleged that she sustained between 1999 and July 1, 2000, the day on which the ban on video poker became effective.

## I.      Factual / Procedural History

Beginning in 1995, Proctor started gambling on video gaming machines at various restaurants and bars in Columbia, South Carolina.  From 1999 to 2005, Proctor frequently gambled on video poker machines located in Rockaways and

---

[1]  "The doctrine of *in pari delicto* is the principle that a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing."  *Myatt v. RHBT Fin. Corp.*, 370 S.C. 391, 395, 635 S.E.2d 545, 547 (Ct. App. 2006) (internal quotation marks and alterations omitted).

Pizza Man, which are operated by Whitlark & Whitlark, Inc. ("Whitlark"). Forest Whitlark and Paul Whitlark are part owners of Whitlark. At the time, Charlie E. Bishop and Brett Blanks co-owned a limited liability company named Zodiac Distributing, LLC, which placed one coin-operated gaming machine at the Pizza Man restaurant.

According to Proctor, she lost between $1,000 and $5,000 per week while gambling at the restaurants. Proctor claimed the two restaurants provided her cash advances on her credit cards to enable her to fund her gambling, as well as free food, alcohol, and cocaine.[2]

Proctor also funded her gambling with money illegally obtained from her employer State Title, which her mother owned. State Title provided real estate closing services to attorney Walter Smith. During the time period at issue, Proctor forged her mother's name on checks and stole money from Smith's trust account in order to play the video poker machines. As a result of Proctor's actions, Smith's trust account contained insufficient funds to satisfy the mortgages on several properties at closing. In turn, Trans-Union[3] paid approximately $550,000 in claims stemming from the shortages in Smith's trust account.

Effective July 1, 2000, the Legislature banned the operation of video poker machines in South Carolina.[4] Proctor continued to gamble despite being aware that her use of the video poker machines was illegal. Pizza Man and Rockaways continued to operate video poker machines in their establishments until a Federal Bureau of Investigation sting operation, in which Proctor assisted, occurred in 2005.

On September 10, 2007, Proctor entered into a plea agreement with federal prosecutors and pled guilty to mail fraud pursuant to 18 U.S.C. § 1341. As part of the agreement, Proctor was required to pay restitution in the amount of $565,475.25 to Trans-Union and $195,000 to Smith.

---

[2] Proctor offered evidence that she paid in excess of $500,000 in gambling debt to the restaurants, which she documented with copies of checks paid to the restaurants in the amount of $387,623.65, credit card transactions in the amount $28,057.69, and debit card withdrawals in the amount of $91,598.47.

[3] At the time, Trans-Union was named Atlantic Title Insurance Company.

[4] Act No. 125, 1999 S.C. Acts 1319.

Proctor and Trans-Union brought this action against Defendants to recover the losses they incurred as a result of Proctor's gambling.[5] The Complaint alleged, *inter alia*, that Defendants violated section 32-1-10[6] of the South Carolina Code and the legislative prohibition against operating video gaming machines. As a result, Proctor and Trans-Union asserted claims for unjust enrichment, civil conspiracy, violations of UTPA[7], and negligence.

---

[5] Trans-Union filed a separate action against Proctor. Ultimately, Proctor entered a Confession of Judgment in favor of Trans-Union in the amount of $461,495.32.

[6] Section 32-1-10 provides:

> *Any person* who shall at any time or sitting, by playing at cards, dice table or any other game whatsoever or by betting on the sides or hands of such as do play at any of the games aforesaid, lose to any person or persons so playing or betting, in the whole, the sum or value of fifty dollars and shall pay or deliver such sum or value or any part thereof *shall be at liberty*, within three months then next ensuing, *to sue for and recover the money or goods so lost and paid or delivered or any part thereof from the respective winner or winners thereof, with costs of suit, by action to be prosecuted in any court of competent jurisdiction.*

S.C. Code Ann. § 32-1-10 (2007) (emphasis added).

[7] Section 39-5-140 of UTPA provides in pertinent part:

> *Any person who suffers any ascertainable loss of money* or property, real or personal, *as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by § 39-5-20 may bring an action individually*, but not in a representative capacity, to recover actual damages. If the court finds that the use or employment of the unfair or deceptive method, act or practice was a willful or knowing violation of § 39-5-20, the court shall award three times the actual damages sustained and may provide such other relief as it deems necessary or proper. Upon the finding by the court of a violation of this article, the court shall award to the person bringing such action under this section reasonable attorney's fees and costs.

Defendants filed motions for summary judgment, alleging that (1) Proctor's claims were barred by the doctrine of *in pari delicto*, (2) Proctor was precluded from recovering her claim for unjust enrichment based on the equitable doctrine of "unclean hands," and (3) Trans-Union lacked standing. In response, Proctor and Trans-Union filed a cross-motion for partial summary judgment as to the liability of Defendants.

Following a hearing, the circuit court granted Proctor's motion for partial summary judgment.[8] In so ruling, the court found the doctrine of *in pari delicto* had been abrogated with regard to gambling losses. Specifically, the court found that "the South Carolina legislature abrogated this doctrine in passing a number of statutes, including S.C. Code Ann. §§ 32-1-10, 32-1-20,[9] and the South Carolina Unfair Trade Practices Act." Further, the court relied on this Court's decision in *Johnson v. Collins Entertainment Company,* 349 S.C. 613, 564 S.E.2d 653 (2002) for the proposition that:

---

S.C. Code Ann. § 39-5-140(a) (1985) (emphasis added); *see id.* § 39-5-20(a) ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.").

[8] As threshold matters, the court found that Proctor had standing and timely filed the lawsuit against Charlie Bishop and Brett Blanks within the three-year statute of limitations. The court ruled, however, that Trans-Union lacked standing to assert any claims against Defendants.

[9] Section 32-1-20 states:

> In case any person who shall lose such money or other thing as aforesaid shall not, within the time aforesaid, really and bona fide and without covin or collusion sue and with effect prosecute for the money or other things so by him or them lost and paid and delivered as aforesaid, it shall be lawful for *any other person*, by any such action or suit as aforesaid, *to sue for and recover the same and treble the value thereof, with costs of suit*, against such winner or winners as aforesaid, the one moiety thereof to the use of the person that will sue for the same and the other moiety to the use of the county in which the offense shall have been committed.

S.C. Code Ann. § 32-1-20 (2007) (emphasis added).

> Sections 32-1-10 and 32-1-20 do not have preclusive effect regarding remedies afforded under the South Carolina Unfair Trade Practices Act because S.C. Code Ann. § 39-5-160 provides that powers and remedies under this section are cumulative and supplementary to all powers and remedies provided by existing law.

Additionally, the court granted Defendants' motion for summary judgment on Proctor's unjust enrichment claim based on their unclean hands defense.

After the court denied their motion for reconsideration, Defendants appealed to the Court of Appeals. The Court of Appeals affirmed. *Proctor v. Whitlark & Whitlark, Inc.*, 406 S.C. 225, 750 S.E.2d 93 (Ct. App. 2013). Like the circuit court, the Court of Appeals relied on this Court's decision in *Johnson* and held that sections 32-1-10 and 32-1-20 of the South Carolina Code, which authorize gamblers and affected third parties to recover gambling losses in certain limited circumstances, were viable despite the existence of the *in pari delicto* doctrine. *Id.* at 230, 750 S.E.2d at 95. Further, the court ruled that the gambling loss statutes were not the exclusive remedy and, therefore, Proctor could seek to recover her losses under other applicable laws, including UTPA. *Id.* at 231, 750 S.E.2d at 96.

Although the Court of Appeals acknowledged that the facts in *Johnson* were distinguishable from those in Proctor's case, since video poker was generally legal at the time of the *Johnson* case, it found three tenants recognized by this Court in *Johnson* were instructive and lead to the same conclusion as the circuit court that an *in pari delicto* defense did not bar Proctor's claims. *Id.* at 230, 750 S.E.2d at 95. The Court of Appeals stated:

> First, statutory and case law in South Carolina support the policy of allowing plaintiffs to recover gambling losses as a way of both discouraging illegal gambling and of protecting gamblers and their family members from imprudent gambling activities. *See Johnson,* 349 S.C. at 635, 564 S.E.2d at 664–65 (noting that sections 32–1–10 and –20 promote a policy of limiting excessive and/or unlawful gambling); S.C. Code Ann. §§ 32–1–10, –20. Second, the owners and operators of video poker machines are not truly *in pari delicto* with the persons who use the machines for gambling because in many cases, a habitual gambler is acting under the sway of "uncontrollable impulses" and, thus, requires protection from his or her bad judgment. *See Johnson,* 349 S.C. at 635, 564 S.E.2d at 664–65. Finally, sections

32–1–10 and –20 are not the exclusive avenues for plaintiffs to recover gambling losses and do not preclude plaintiffs from seeking recovery under other state law theories, including SCUTPA. *See Johnson,* 349 S.C. at 635, 564 S.E.2d at 665 (noting that sections 32–1–10 & and –20 do not preclude plaintiffs from recovering gambling losses under other remedies provided by law, including SCUTPA). We find these tenets espoused by the supreme court in *Johnson* support the circuit court's holding that the defense of *in pari delicto* does not bar Proctor's claims.

*Id.* at 230-31, 750 S.E.2d at 95-96.

Following the denial of their petition for rehearing *en banc*, this Court granted Petitioners' request for a writ of certiorari to review the decision of the Court of Appeals.

## II. Standard of Review

When reviewing the grant of a summary judgment motion, an appellate court applies the same standard that governs the trial court under Rule 56(c), SCRCP, which provides that summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), SCRCP; *Fleming v. Rose*, 350 S.C. 488, 493, 567 S.E.2d 857, 860 (2002). "Determining the proper interpretation of a statute is a question of law, and this Court reviews questions of law de novo." *Town of Summerville v. City of N. Charleston*, 378 S.C. 107, 110, 662 S.E.2d 40, 41 (2008).

## III. Discussion

### A. Arguments

Petitioners primarily contend the Court of Appeals erred in holding that the doctrine of *in pari delicto* has been abrogated. In support of this contention, Petitioners claim the Court of Appeals: (1) ignored the express limitations of sections 32-1-10 and 32-1-20, which provide the exclusive remedy for losses sustained by illegal gambling; (2) misinterpreted this Court's decision in *Johnson* as that case was decided when video poker was legal unlike the current matter where Proctor gambled while admittedly knowing her actions were illegal; and (3) erred in relying on cases from other jurisdictions because any decision is controlled by sections 32-1-10 and 32-1-20.

Based on these purported errors, Petitioners maintain that the Court of Appeals created new law that allows a person, who voluntarily engages in an illegal trade or activity, to recover under UTPA. By doing so, Petitioners aver that the Court of Appeals' decision not only contradicts public policy of this state and this Court's decisions, but also effectively eliminates any personal responsibility of the gambler.

## B.     Analysis

### a.     Abrogation of the Doctrine of *In Pari Delicto*[10]

The doctrine of *in pari delicto* is grounded in the "general principle that a person cannot base a cause of action upon an illegal or immoral act, transaction or contract." 4 S.C. Jur. *Action* § 21 (1991 & Supp. 2015). "It has been succinctly stated that no court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act." *Id.* (internal quotation marks and alterations omitted). "The policy is reflected in the general rules providing that where parties are in pari delicto, that is, equally in the wrong, no affirmative relief will be given to one against the other and that no one shall be permitted to profit by his own wrong." *Id.* (footnote omitted). "On the other hand, there may be an overriding policy consideration that permits relief to be granted." *Id.*

### 1.  Legislative Pronouncements

Despite the well-established doctrine of *in pari delicto*, the Legislature in 1712 received into law[11] the precursors to sections 32-1-10 and 32-1-20 to permit

---

[10] Petitioners cite to several cases from the 1800's for the proposition that the doctrine of *in pari delicto* is still recognized as a viable defense to a lawsuit for the recovery of gambling losses. *See, e.g.*, *Rice v. Gist*, 32 S.C.L. (1 Strob.) 82, 85 (1846) (stating, "all wagers are unlawful, and not to be recovered in courts of justice"). Petitioners are correct that the doctrine of *in pari delicto* is well-established and still recognized by our appellate courts. *See Myatt v. RHBT Fin. Corp.*, 370 S.C. 391, 395, 635 S.E.2d 545, 547 (Ct. App. 2006) (recognizing doctrine of *in pari delicto*). However, due to more recent statutory enactments and case law, these early cases are of "doubtful utility." *See* 7 S.C. Jur. *Gaming* § 2 (1991 & Supp. 2015).

[11] In 1712, the South Carolina Legislature adopted the English Statute of Anne, which included the gambling loss recovery provisions. *Berkebile v. Outen*, 311

relief for one engaged in gambling based on "a policy which prevents a gambler from allowing his vice to overcome his ability to pay." *Justice v. The Pantry*, 330 S.C. 37, 44, 496 S.E.2d 871, 875 (Ct. App. 1998), *aff'd as modified*, 335 S.C. 572, 518 S.E.2d 40 (1999). Thus, based on this overriding policy consideration, the Legislature provided a means by which a gambler could "recover excessive gambling losses" or by which another person could "recover the losses if the gambler fails to do so." *Id.* at 44-45, 496 S.E.2d at 875.

Notably, these code sections were drafted in general terms and did not qualify whether recovery was permitted for losses sustained by illegal gambling. Consequently, as originally codified, the Legislature created a civil remedy akin to a strict liability offense as it authorized "any person" or third party to recover for gambling losses regardless of the legality of the game. By implication, the Legislature abrogated the doctrine of *in pari delicto* as it authorized an at-fault party to recover losses sustained by illegal gambling.

Sections 32-1-10 and 32-1-20 remained essentially unchanged until 2000. *Justice v. The Pantry*, 335 S.C. 572, 577 n.2, 518 S.E.2d 40, 43 n.2 (1999) ("Sections 32-1-10 & -20 were originally adopted in 1712 and statutory language has changed very little since then."). Effective July 1, 2000, the Legislature promulgated Act No. 125 to ban video gambling. Act No. 125, 1999 S.C. Acts 1319. As part of this Act, the Legislature expressly amended sections 32-1-10 and 32-1-20. Act No. 125, 1999 S.C. Acts 1319, 1384. Significantly, the Legislature enacted section 32-1-60, which states that "[b]eginning on the effective date of this section, the provisions of Sections 32-1-10, 32-1-20, and 32-1-30 apply *only* to those gambling activities *not authorized by law*." S.C. Code Ann. § 32-1-60 (2007) (emphasis added); *see Joytime Distribs. & Amusement Co. v. State*, 338 S.C. 634, 649, 528 S.E.2d 647, 655 (1999) (analyzing substantive parts of Act No. 125 and stating that "Part IV amends S.C. Code Ann. §§ 32-1-10 to -30, to allow for recovery of gambling losses only where the gambling activity which resulted in the loss is unlawful").

By enacting section 32-1-60, the Legislature purposefully retained sections 32-1-10 and 32-1-20 and limited their application to losses sustained by illegal gambling. More specifically, because video poker is no longer authorized by law, the Legislature clearly intended for gamblers or third parties to recover losses sustained by *illegal* video poker gambling. As a result, section 32-1-60 constitutes

---

S.C. 50, 52-54, 426 S.E.2d 760, 762-63 (1993) (chronicling the history of the gambling loss statutes).

definitive evidence that the Legislature abrogated the doctrine of *in pari delicto* in the context of recovery for illegal gambling losses. *See Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d 578, 581 (2000) ("What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will. Therefore, the courts are bound to give effect to the expressed intent of the legislature." (quoting Norman J. Singer, *Sutherland Statutory Construction* § 46.03, at 94 (5th ed. 1992))). However, this conclusion does not end our analysis as we must also determine whether the gambling loss statutes are the exclusive remedy.

## 2. Judicial Pronouncements

Although our decisions have effectuated the intent of the Legislature to permit recovery for illegal gambling losses under sections 32-1-10 and 32-1-20, this Court has expanded recovery beyond these statutes. We take this opportunity to re-evaluate a line of decisions that implicitly permit one engaged in illegal gambling to recover under UTPA. For reasons that will be discussed, we find these decisions are contrary to the intent of our Legislature.

In a case pre-dating the ban on video gambling, this Court considered "whether S.C. Code Ann. § 32-1-10 (1991), requires the playing of an illegal game as a prerequisite to the recovery of a gambling loss." *Berkebile v. Outen*, 311 S.C. 50, 52, 426 S.E.2d 760, 761 (1993). In analyzing this question, the Court initially noted that "[e]xcept for the changing of [the] monetary threshold, this statute has remained unchanged since 1712, when it was adopted from English law by the 'reception statute' passed by the South Carolina colonial assembly." *Id.* at 52-53, 426 S.E.2d at 762. The Court rejected the argument that the statute requires the gambling to be illegal, finding the statute does not specifically mention illegal gambling as a prerequisite to recovery and not all gambling has been illegal during the centuries the statute has been in effect. *Id.* at 53, 426 S.E.2d at 762. In reaching this conclusion, the Court explained:

> An illegal contract has always been unenforceable, so there is little need for the statute to remain in effect if it is limited solely to illegal gambling. . . . When the statute was originally adopted, the legality of a game may not have been an issue; however, during the statute's lengthy history, gambling in some form has not always been illegal. It therefore stands to reason that *it was not necessarily a futile gesture by the legislature to maintain the status quo, especially when other statutes, related to gambling on non-payout machines, were being amended.*

*Id.* at 53-54, 426 S.E.2d at 762 (footnote omitted and emphasis added).

Further, the Court recognized that section 32-1-10 applies regardless of the legality of the game. Specifically, the Court stated:

> In fact, Berkebile posits the more compelling argument, that the statute has the effect of protecting a gambler, *regardless of the legality of the game*, from abusing the vice and exceeding limits which bring harm to the gambler and his or her family.
>
> To discover further support for Berkebile's proposition, one need look no further than the Statutes at Large which adopted the English Statutes of Anne in 1712. The applicable act which has evolved into § 32-1-10 was originally titled, "An Act for the better Preventing of **excessive** and deceitful Gaming."

*Id.* at 54, 426 S.E.2d at 762-63 (first emphasis added and footnote omitted). The Court went on to state that, since the statute does not include an explicit requirement that the gambling be illegal, it would not go beyond the plain and ordinary meaning of the statute to find that an illegal game must exist as an element of recovery under section 32-1-10. *Id.* at 55, 426 S.E.2d at 763.

Six years after *Berkebile*, at a time when video poker was still legal, this Court considered a class action lawsuit brought by gamblers against owners and operators of video poker machines, alleging causes of action pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") and UTPA based on the operators offering "special inducements" by advertising jackpots in excess of the statutory $125 payout limit. *Gentry v. Yonce*, 337 S.C. 1, 522 S.E.2d 137 (1999). On appeal, the Court analyzed whether the circuit court erred in granting the video poker operators' motion to dismiss both causes of action. *Id.* at 4-5, 522 S.E.2d at 138-39. Ultimately, the Court found the gamblers sufficiently pled their causes of action. *Id.* at 14, 522 S.E.2d at 144. The Court concluded that "on the basis of the complaint it cannot be stated appellants are not entitled to any relief whatsoever." *Id.* Although the analysis was limited due to the procedural posture of the appeal, the Court recognized that gamblers may present cognizable claims under RICO and UTPA to recover for losses incurred during gambling. *Id.*

Three years later, this Court reaffirmed its holding in *Gentry*. *Johnson v. Collins Entm't Co.*, 349 S.C. 613, 564 S.E.2d 653 (2002). In *Johnson*, gamblers

brought suit in June 1997, a time in which video poker was legal but limited by law, alleging that defendants operated video poker machines in a manner that violated state law limiting the amount of payouts. *Id.* at 621, 564 S.E.2d at 657. The gamblers asserted causes of action under RICO, the South Carolina UTPA, and sections 32-1-10 and 32-1-20. *Id.*

One of the seven issues certified to this Court by the United States District Court for the District of South Carolina was whether sections 32-1-10 and 32-1-20 provide the exclusive remedy for gambling losses and, thus, precludes recovery under other state law theories. *Id.* at 634, 564 S.E.2d at 664. With respect to the plaintiffs' claims under UTPA, the Court found sections 32-1-10 and 32-1-20 had no preclusive effect. *Id.* at 635, 564 S.E.2d at 665. The Court stated:

> There is nothing in sections 32-1-10 and 20 to indicate the legislature intended to limit relief otherwise available. These statutes were passed in 1712, and we cannot hold that they were intended to pre-empt all future remedies for persons *injured by unlawful gambling activities*.

*Id.* Additionally, the Court emphasized that section 39-5-160 of UTPA states, "The powers and remedies provided by this article shall be cumulative and supplementary to all powers and remedies otherwise provided by law." *Id.* (quoting section 39-5-160 of UTPA). Further, the Court noted that its decision in *Gentry* "clearly envision[ed] that both remedies would be available to the plaintiffs." *Id.* The Court explained that "[n]othing in [*Gentry*] would indicate sections 32-1-10 and 20 were the sole causes of action available to plaintiffs." *Id.*

The Court also rejected the operators' attempt to shift the blame to the gamblers based on an *in pari delicto* defense. In a footnote, the Court stated:

> The operators and machines at issue are licensed to operate in a regulated area of the law. They should, therefore, be held to a greater knowledge and understanding of the laws than their customers, particularly where the laws are designed to protect the player from his or her own bad judgment. In any case, what the law prohibits is the *making* of the payouts in excess of the statutory cap. It does not directly address the *receipt* of the funds. Thus, *while this court is not willing to suggest that the player who receives an excess payment is without fault*, the fault or culpability is certainly not "equal."

*Id.* at 638-39 n.13, 564 S.E.2d at 667 n.13 (third emphasis added).

Although *Berkebile*, *Gentry*, and *Johnson* were based on facts that occurred when video gambling was legal, we affirm these decisions to the extent that their holdings are consistent with the gambling loss statutes as currently codified. Specifically, we find these decisions correctly suggested that sections 32-1-10 and 32-1-20 permit recovery for gambling losses sustained by illegal gambling. However, we overrule *Gentry* and *Johnson* to the extent these decisions authorized a gambler or third party to recover for illegal gambling losses under UTPA. We now hold that the gambling loss statutes are the exclusive remedy. While we recognize that our decision is a departure from the doctrine of *stare decisis*,[12] we find this conclusion is necessitated by the clear intent of the Legislature and for public policy reasons.

We find determinative the disparity in the potential recovery for a claim under section 32-1-10 versus UTPA.[13] If a gambler prevails on a cause of action under UTPA, he or she has the potential of profiting from his or her illegal activity. Pursuant to section 39-5-140(a) of UTPA, a person who prevails is authorized to recover actual damages, attorney's fees and costs, and potentially treble damages. Yet, under section 32-1-10 a gambler is not entitled to recover treble damages.[14]

---

[12] It is well-established that we need not blindly adhere to established precedent. *See McLeod v. Starnes*, 396 S.C. 647, 654, 723 S.E.2d 198, 202 (2012) ("When the court is asked to follow the line marked out by a single precedent case it is not at liberty to place its decision on the rule of *stare decisis* alone, without regard to the grounds on which the antecedent case was adjudicated. . . . An original case could not possibly gain authority by a mere perfunctory following on the principle of *stare decisis*." (quoting *State v. Williams*, 13 S.C. 546, 545-55 (1880))).

[13] We also note the disparity in the respective statute of limitations. A cause of action under section 32-1-10 must be filed within three months of the loss whereas a cause of action under UTPA must be filed within three years after discovery of the unlawful conduct. *See* S.C. Code Ann. § 39-5-150 (1985) ("No action may be brought under this article more than three years after discovery of the unlawful conduct which is the subject of the suit.").

[14] Yet, we note that a third party may recover treble damages under section 32-1-20 and the county in which the offense occurred is entitled to receive half of the amount recovered.

Significantly, our appellate courts have expressly ruled that a gambler is only entitled to net losses. *See McCurry v. Keith*, 325 S.C. 441, 444, 481 S.E.2d 166, 168 (Ct. App. 1997) (stating, in a case pre-dating the ban of video poker, "[t]o allow a gambler to recover losses and pocket winnings would create a perverse result *contrary to legislative intent*: Granting a windfall to a gambler would neither punish excessive gaming nor protect a gambler and his family from the gambler's irresistible impulses" (emphasis added)).

We believe that to permit a gambler to recover a windfall under UTPA when the Legislature has specifically limited losses to actual damages under section 32-1-10 would be in direct contravention of legislative intent. *Cf. Capco of Summerville, Inc. v. J.H. Gayle Constr. Co.*, 368 S.C. 137, 142, 628 S.E.2d 38, 41 (2006) ("Where there is one statute addressing an issue in general terms and another statute dealing with the identical issue in a more specific and definite manner, the more specific statute will be considered an exception to, or a qualifier of, the general statute and given such effect."). We will not expand the scope of recovery authorized by the Legislature.

Furthermore, if a gambler were permitted to recover under UTPA for losses sustained by illegal gambling, such a decision would have significant repercussions. Taken to its logical extreme, anyone engaged in an illegal activity could allege an UTPA claim to recover losses sustained by the illegal activity. For example, one who purchases illegal drugs could seek to recover against the drug dealer pursuant to UTPA. We do not believe this was the intent of the Legislature. Rather, by enacting section 32-1-60 in 2000, we conclude the Legislature purposefully retained sections 32-1-10 and 32-1-20 to provide the exclusive remedy for losses sustained by illegal gambling.

### 3.    Application

Despite our holding, we must affirm a portion of the result reached by the Court of Appeals. In granting Proctor's motion for partial summary judgment as to the liability of Defendants, the circuit court found that "the operation of video poker machine[s] in contravention of state law is an unfair act as defined in the [UTPA]."[15] Petitioners have not appealed this ruling. Thus, it is now the law of

---

[15]  "To recover in an action under the UTPA, the plaintiff must show: (1) the defendant engaged in an unfair or deceptive act in the conduct of trade or commerce; (2) the unfair or deceptive act affected [the] public interest; and (3) the plaintiff suffered monetary or property loss as a result of the defendant's unfair or

the case. *See Shirley's Iron Works, Inc. v. City of Union*, 403 S.C. 560, 573, 743 S.E.2d 778, 785 (2013) ("An unappealed ruling is the law of the case and requires affirmance."). Consequently, based on the distinct facts of this case, we are constrained to find that Proctor has a viable claim under UTPA.

Nonetheless, Proctor is only entitled to seek recovery for those losses that were allegedly sustained prior to July 1, 2000, the effective date of the ban on video poker. In her pleadings, Proctor alleged that she sustained gambling losses "[b]eginning in 1999, and continuing until June 2005." Because it was legal for Proctor to engage in video poker prior to July 1, 2000, we find that she may pursue her UTPA claim for gambling losses allegedly sustained between 1999 and July 1, 2000. We emphasize that this case was presented in the posture of a summary judgment motion. Thus, Proctor still bears the burden of proving her alleged damages.

## IV. Conclusion

Based on the foregoing, the decision of the Court of Appeals is

**AFFIRMED IN PART AND REVERSED IN PART.**

**KITTREDGE, J., and Acting Justices James E. Moore and Letitia H. Verdin, concur. TOAL, C.J., concurring in part and dissenting in part in a separate opinion.**

---

deceptive act(s)." *Wright v. Craft,* 372 S.C. 1, 23, 640 S.E.2d 486, 498 (Ct. App. 2006). "An act is 'unfair' when it is offensive to public policy or when it is immoral, unethical, or oppressive." *Gentry v. Yonce,* 337 S.C. 1, 12, 522 S.E.2d 137, 143 (1999). "An act is 'deceptive' when it has a tendency to deceive." *Id.*

**CHIEF JUSTICE TOAL:** I concur in part and respectfully dissent in part. I concur with the majority in affirming the court of appeals' decision allowing Proctor to pursue her UTPA claim for gambling losses she sustained between 1999 and July 1, 2000—a period of time in which video poker was legal in South Carolina. I further concur with the majority's finding that the doctrine of *in pari delicto* does not prevent recovery in this situation. Indeed, the operators of video poker machines should "be held to a greater knowledge and understanding of the laws than their customers," and while those who play the machines are not without fault, "the fault or culpability is certainly not 'equal.'" *Johnson v. Collins Entm't Co.*, 349 S.C. 613, 639 n.13, 564 S.E.2d 653, 667 n.13 (2002). Nevertheless, I write to emphasize that the General Assembly has not altogether abolished the doctrine of *in pari delictio*, but instead, has indicated an intention to depart from the doctrine with respect to illegal gambling losses.[16]

Unlike the majority, however, I would hold that Proctor may pursue her UTPA claim for losses sustained after July 1, 2000, because I find the majority's decision prohibiting Proctor's UTPA claim for losses sustained while video poker was illegal to be a departure from our precedent, as well as South Carolina's anti-gambling public policy. Therefore, I dissent from the majority's reversal of the court of appeals' decision upholding the circuit court's order granting Proctor's motion for summary judgment on her UTPA claim.

As the majority acknowledges, this Court's opinions in *Johnson* and *Gentry v. Yonce*, 337 S.C. 1, 522 S.E.2d 137 (1999), at the least, do not prohibit—and at the most, authorize—a gambler or third party's UTPA claim to recover for illegal gambling losses. *See Johnson*, 349 S.C. at 635, 564 S.E.2d at 665; *Gentry*, 337 S.C. at 14, 522 S.E.2d at 144. I disagree with the majority's decision to partially overrule those cases for two reasons. First, the General Assembly has not responded to *Johnson* and *Gentry* to indicate its intention that sections 32-1-10 and 32-1-20 of the South Carolina Code provide the exclusive remedy for losses sustained by illegal gambling. Moreover, unlike the majority, I do not find the damages recoverable under those statutes indicative of the General Assembly's

---

[16] The majority states that allowing a gambler to recover under UTPA for losses sustained by illegal gambling could lead to "anyone engaged in an illegal activity [being able to] allege an UTPA claim to recover losses sustained by the illegal activity." However, because the General Assembly has only abolished the *in pari delictio* doctrine in very limited circumstances, it is my opinion that the majority's statement presents an inconceivable result, especially given this Court's consciousness of public policy concerns.

intent on this matter.  Rather, in my view, without evidence to the contrary, recovery under the UTPA is "cumulative and supplementary" to recovery under sections 32-1-10 and 32-1-20, and the recovery provided by those statutes has no bearing on the possible UTPA claim.  *See* S.C. Code Ann. § 39-5-160 (1985) ("The powers and remedies provided by [the UTPA] shall be cumulative and supplementary to all powers and remedies otherwise provided by law.").

Second, in my view, it is contrary to our state's public policy to disallow Proctor's ability to recover all of her losses sustained from gambling under the UTPA.  After the state's legal prohibition against video gambling dissolved in 1986, the video gambling industry in South Carolina quickly built an expansive and hugely profitable operation.  *See* R. Randall Bridwell & Frank L. Quinn, *From Mad Joy to Misfortune: The Merger of Law & Politics in the World of Gambling*, 72 Miss. L.J. 565, 573–80 (2002) (providing a definitive history of video gambling in South Carolina).  However, due to the extensive social costs caused by this "unexpected and unintended gambling business," it wasn't long before the industry began to come undone.  *Id.* at 580.  This Court's aversion to video gambling—and more importantly, its serious repercussions to gamblers and their families—was first evidenced in *Berkebile v. Outen*, 311 S.C. 50, 426 S.E.2d 760 (1993), in which the Court permitted a gambler to bring an action to recover losses from playing video poker under an old state statute (the state version of the Statute of Anne).  This Court found more compelling the gambler's argument that "the statute has the effect of protecting a gambler, regardless of the legality of the game, from abusing the vice and exceeding limits which bring harm to the gambler and his or her family."  *Id.* at 54, 426 S.E.2d at 762–63.  The Court further noted the General Assembly's intention to "adopt[] a policy to protect a citizen and his family from the gambler's uncontrollable impulses."  *Id.* at 55, 426 S.E.2d at 763.  When this Court answered certified questions in *Johnson* in 2002, it reiterated the goal of limiting excessive gambling and protecting gamblers and their families from allowing the gambler's vice to overcome his ability to pay.  349 S.C. at 635, 564 S.E.2d at 664–65 (citation omitted).[17]

For these reasons, I would allow Proctor to pursue her UTPA claim in full against Defendants, who engaged in deliberate conduct that fed Proctor's gambling addiction.  Accordingly, I would affirm in full the court of appeals' decision

---

[17] In my view, Proctor is not a sympathetic figure, and similar to the majority, I do not wish to grant her a windfall.  If Proctor recovers under UTPA for all of her gambling losses, however, it would appear that her recovery would be used to satisfy her outstanding Confession of Judgment in favor of Trans-Union.

affirming the circuit court's order granting Proctor's motion for summary judgment on the issue of liability.